## MISSOURI, K. & T. TRUST CO. v. KRUMSEIG et al.[1]

(Circuit Court of Appeals, Eighth Circuit. November 5, 1896.)

No. 756.

**1. USURY—INSTALLMENT PAYMENTS—INSURANCE.**

One K., having applied to the M. Co. for a loan of $2,000, entered into a contract with it, secured by a mortgage, and providing that he should give to the M. Co. 10 promissory notes, for $360 each, payable in monthly installments of $30, and that, in case of K.'s death before all such payments were made, the unpaid portion of the debt should be released if all payments up to K.'s death should have been promptly met. K. also agreed to pass a medical examination, and pay the fee therefor. At the same time, the M. Co., pursuant to a general contract between it and the P. Ins. Co., applicable to like cases, obtained from the insurance company a policy on K.'s life, which fully indemnified it from any possibility of loss in case of K.'s death before the full payment of his notes. The amount agreed to be paid by K. was largely in excess of the principal of the loan, with the highest interest allowed by law, and the cost of the insurance paid for by the M. Co. *Held*, that the contract was a cover for usury, and void under the statute of Minnesota (Gen. St. 1888, c. 23, §§ 1–4). 71 Fed. 350, affirmed.

**2. USURIOUS CONTRACT—EQUITABLE RELIEF—TENDER.**

Under the statutes of Minnesota relating to usury, as construed by the courts of the state, whose construction is binding upon the federal courts, a borrower, seeking relief in equity from a usurious contract, is not required to pay or tender the amount of the loan, with legal interest, as a condition of obtaining such relief. 71 Fed. 350, affirmed. Sanborn, Circuit Judge, dissenting.

**3. FEDERAL COURTS—EQUITY PRACTICE—STATE STATUTES.**

Though the practice of the federal courts in equity is regulated by themselves and by the rules of the supreme court, and cannot be varied by state laws, the substantive rules of equity law administered by the federal courts can be abrogated or changed by state statutes. Accordingly, *held*, that the statute of Minnesota abrogating the equity rule that a borrower, seeking relief from a usurious contract, must tender the amount of the loan, with legal interest, as condition of relief, is binding on the federal courts in that state. Sanborn, Circuit Judge, dissenting.

**4. LIFE INSURANCE—USURIOUS CONTRACT.**

The contract above described is a contract of life insurance, and the failure of the company making it to comply with the insurance laws of the state renders it void at the election of the insured, and a court of equity will not require the insured to await a suit against him on the illegal contract to which he has an absolute defense, but will relieve him by ordering the contract executed in violation of the statute to be surrendered and canceled. The parties in the case are not in pari delicto.

Appeal from the Circuit Court of the United States for the District of Minnesota.

This was a bill filed in the district court of St. Louis county, Minn., by Theodore M. Krumseig and Louise Krumseig, the appellees, against the Missouri, Kansas & Texas Trust Company, a corporation organized under the laws of Missouri, the appellant, to cancel a mortgage executed by the appellees to the appellant on real estate in the city of Duluth, upon the ground that the same was void for usury, and upon the further ground that it was a contract for life insurance, and void because the appellant was a foreign corporation, and had not complied with the laws of Minnesota to entitle it to do business in that state. On the application of the appellant, the cause was removed from the state court into the circuit court of the United States for the district of Minnesota on the ground of the diverse citizenship of the parties. On the 29th of July, 1890, Theodore M. Krumseig, one of the

[1] Rehearing denied December 14, 1896.

appellees, made application to the appellant to borrow $2,000. The application was made according to a form prescribed by the appellant, and reads as follows: "I hereby make application to the Missouri, Kansas and Texas Trust Co., of Kansas City, Mo., for a loan of $2,000.00 upon lot No. seven (7), block No. sixty-two (62), of Portland Division addition, city of Duluth, county of St. Louis, state of Minnesota, which property I now own in fee, and the abstract to which accompanies this application." Here follow some statements relating to the domestic and business affairs of Krumseig, and a description of the property to be mortgaged. The application then continues:

"In consideration of the above premises, I agree to execute and deliver to the said company 10 promissory notes, each of the sum of $360, payable in monthly installments of $30.00, commencing at date of signing contract. The said notes cover principal sum loaned, interest, and cost of guaranty to cancel debt in case of death, and shall be secured by good and sufficient deed of trust or mortgage executed by myself and wife on said ground and improvements. The contract hereafter to be entered into, if my application should be accepted and contract entered into in writing between myself and said company, shall provide that the mortgage or deed of trust given to secure the above notes shall contain a clause guarantying, in case of my death before payment of any unpaid installments, a release of unpaid portion of debt, if I shall have promptly paid previous installments and kept other conditions. As part of foregoing condition, I agree, before acceptance of this application and the execution of said contract, to pass such medical examination as may be required by said company, and to pay said company the usual fee of $3.00 therefor, and to pay all fees for recording deed of trust or mortgage. This application and proposal to stand open for acceptance for ten days from date hereof.

"[Signed]                                        Theodore M. Krumseig.

"Date July 29th, 1890."

Krumseig submitted to a medical examination such as is required of applicants for life insurance, and executed the promissory notes and mortgage provided for in the application, the latter of which contains the following provision: "And it is further understood by and between the said parties of the first part, their executors, administrators, or assigns, and the said party of the second part, the Missouri, Kansas & Texas Trust Company, that in case said Theodore M. Krumseig, one of the parties of the first part, should die after the execution and delivery of the said notes and this mortgage, and within ten years thereafter, each and every of the said notes remaining unpaid at the said date shall be surrendered to the executors or administrators of the said Theodore M. Krumseig, one of the parties of the first part, and this mortgage shall be canceled and satisfied: provided, however, that said parties of the first part shall have promptly paid each monthly installment that shall have become due prior to his death, according to the terms of the notes hereinbefore mentioned, and that he has not committed suicide within two years, and has not, without written consent of the party of the second part, visited the Torrid Zone, or personally engaged in the business of blasting, mining, or submarine operations, or in the manufacture, handling, or transportation of explosives, or entered into the service of any railroad train or on a steam or sailing vessel for two years."

The bill contains this allegation: "Plaintiffs further allege that said contract, whereby, upon the death of said Theodore M. Krumseig, as provided in said contract, defendant was to deliver up the notes and cancel the said mortgage of record, was and is and was so understood and agreed by and between all of the parties thereto, when made, to be a life insurance contract on the life of said Theodore M. Krumseig; that the original application for the said loan of money hereinbefore mentioned was on one of the printed blanks of the defendant, and said application, signed by said Theodore M. Krumseig, expressly stipulated that said Theodore M. Krumseig should pass such satisfactory medical examination as should be required by defendant, and should pay to the defendant a fee of $3 therefor, and that said application for the loan should not be deemed accepted and approved by defendant until

a satisfactory medical examination of said Theodore M. Krumseig had been had; and that thereafter the defendant required the said Theodore M. Krumseig to pass, and said Krumseig did pass, a medical examination, and did pay the said fee of $3 therefor, and said examination was by said defendant submitted to the Prudential Life Insurance Company, of Newark, N. J., with which company defendant had a contract to report on all of defendant's applications for loans in the said state of Minnesota, and, said Prudential Company having reported thereon, said application was thereupon duly accepted, and the notes and mortgage herein described were thereupon executed and delivered to the defendant; and plaintiffs allege, on their information and belief, that, upon favorable report as aforesaid by Prudential Life Insurance Co. on the said Theodore M. Krumseig 'risk,' defendant thereupon entered into a contract with said Prudential Co. whereby said Prudential Co. undertook and agreed to indemnify and save defendant harmless from all loss accruing to defendant under its said contract with the plaintiffs through the possible death of said Theodore M. Krumseig within the life of the said contract."

The answer denies that the contract is usurious; and, touching the averment in the bill that it is a contract for life insurance, the answer "denies the allegations of paragraph 7 of said complaint; denies that said contract was, is, or was by either party thereto understood or agreed to be, a life insurance contract; but admits that it was stipulated that said Theodore M. Krumseig should pass such satisfactory medical examination as should be required by defendant, and should pay a fee therefor to the medical examiner of $3, and that said examination was passed, and said fee so paid, and said examination submitted to the Prudential Life Insurance Company, and that said company reported favorably thereon; but defendant denies that said Prudential Company undertook or agreed to indemnify and save defendant harmless from all or any loss which might accrue to defendant under its contract with plaintiffs through the possible death of said Krumseig or otherwise, and alleges that the contract with said Prudential Company was the ordinary and usual contract with it for the insurance, for the period of said loan, of defendant's insurable interest in the life of said plaintiff."

The agreement between the Prudential Insurance Company and the appellant reads as follows:

"This agreement, made and entered into this twenty-seventh day of February, in the year one thousand, eight hundred and eighty-nine, by and between the Prudential Insurance Company of America, of Newark, N. J., hereinafter designated as the Prudential, and the Missouri, Kansas & Texas Trust Company, of Kansas City, Mo., hereinafter designated as the Trust Company, witnesseth: That the Prudential, in consideration of the premiums hereinafter mentioned, and upon the following terms and conditions, agrees to insure in favor of the trust company the lives of certain persons whose physical condition may be acceptable to the said Prudential:

"First. The persons whose lives are proposed for insurance must be debtors unto the trust company in a sum equal, at least, to the amount of insurance requested.

"Second. The policies of insurance shall be issued upon the renewable reducing term plan. They may be severally renewed for not more than ten successive years, and shall be nonparticipating. The premiums shall be adjusted on the basis of a term insurance for one year, and the amount of insurance under each policy shall decrease each year according to the provisions of the seventh section of this agreement.

"Third. The trust company shall furnish to the Prudential for approval a list of medical examiners, by whom the persons whose lives are to be insured shall be examined.

"Fourth. The expense of conducting the examination shall be borne by the Prudential.

"Fifth. The rates of premium per $1,000 shall be as given in the following table, by which the rate to be paid in each and every year over which each policy extends is that corresponding to the actual age of the life insured in that year:

Premiums per $1,000.

| Age. | Annual | Semiannual. | Quarterly. |
|---|---|---|---|
| 21 | $9 50 | $4 94 | $2 52 |
| 22 | 9 64 | 5 01 | 2 55 |
| 23 | 9 81 | 5 10 | 2 60 |
| 24 | 9 99 | 5 19 | 2 65 |
| 25 | 10 17 | 5 29 | 2 70 |
| 26 | 10 37 | 5 39 | 2 75 |
| 27 | 10 57 | 5 50 | 2 80 |
| 28 | 10 80 | 5 62 | 2 86 |
| 29 | 11 02 | 5 73 | 2 92 |
| 30 | 11 27 | 5 86 | 2 99 |
| 31 | 11 52 | 5 99 | 3 05 |
| 32 | 11 80 | 6 14 | 3 13 |
| 33 | 12 09 | 6 29 | 3 20 |
| 34 | 12 38 | 6 44 | 3 28 |
| 35 | 12 70 | 6 60 | 3 37 |
| 36 | 13 02 | 6 77 | 3 45 |
| 37 | 13 36 | 6 95 | 3 54 |
| 38 | 13 74 | 7 14 | 3 64 |
| 39 | 14 11 | 7 34 | 3 74 |
| 40 | 14 50 | 7 54 | 3 84 |
| 41 | 14 93 | 7 76 | 3 96 |
| 42 | 15 41 | 8 01 | 4 08 |
| 43 | 15 97 | 8 30 | 4 23 |
| 44 | 16 65 | 8 66 | 4 41 |
| 45 | 17 42 | 9 06 | 4 62 |
| 46 | 18 33 | 9 53 | 4 86 |
| 47 | 19 31 | 10 04 | 5 12 |
| 48 | 20 37 | 10 59 | 5 40 |
| 49 | 21 51 | 11 19 | 5 70 |
| 50 | 22 77 | 11 84 | 6 03 |
| 51 | 24 10 | 12 53 | 6 39 |
| 52 | 25 58 | 13 30 | 6 78 |
| 53 | 27 18 | 14 13 | 7 20 |
| 54 | 28 88 | 15 02 | 7 65 |
| 55 | 30 75 | 15 99 | 8 15 |
| 56 | 32 78 | 17 05 | 8 69 |
| 57 | 34 92 | 18 16 | 9 25 |
| 58 | 37 25 | 19 37 | 9 87 |
| 59 | 39 80 | 20 70 | 10 55 |
| 60 | 42 63 | 22 17 | 11 30 |
| 61 | 46 02 | 23 93 | 12 20 |
| 62 | 49 73 | 25 86 | 13 18 |
| 63 | 53 75 | 27 95 | 14 24 |
| 64 | 58 16 | 30 24 | 15 41 |
| 65 | 62 92 | 32 72 | 16 67 |
| 66 | 68 13 | 35 43 | 18 05 |
| 67 | 73 79 | 38 37 | 19 55 |
| 68 | 78 89 | 41 54 | 21 17 |
| 69 | 86 45 | 44 95 | 22 91 |
| 70 | 93 56 | 48 65 | 24 79 |

"Sixth. The trust company shall be allowed a commission of twenty-five per cent. on the premiums paid in the first year of each policy, and a commission of 10 per cent. on the premiums paid in each and every year thereafter during the continuance of the policy.

"Seventh. The amount of insurance to be mentioned in each policy shall be the amount of insurance at the beginning of its first year, and the amount of insurance under each and every policy shall decrease year by year in the proportion exhibited in the appended table, wherein the initial amount is $1,000:

| | | | |
|---|---|---|---|
| First year insurance is | | | $1,000 |
| Second " " " | | | 902 |
| Third " " " | | | 829 |
| Fourth " " " | | | 748 |
| Fifth " " " | | | 660 |
| Sixth " " " | | | 562 |
| Seventh " " " | | | 455 |
| Eighth " " " | | | 337 |
| Ninth " " " | | | 207 |
| Tenth " " " | | | 70 |

"Eighth. When claim is made by the trust company for the insurance under any policy, the said trust company shall furnish to the Prudential proofs of the death of the insured on the forms to be furnished by the Prudential for that purpose. It is also understood and agreed that no claim shall be made by the trust company for an amount greater than the amount of indebtedness of the person whose life was insured to the trust company at the time of his or her death.

"Ninth. Unless otherwise arranged by special agreement, the premiums on the policies issued by the Prudential shall be due and payable at the home office of the said Prudential, in the city of Newark, New Jersey, on the date mentioned in the policies; and, if not so paid on any policy or policies, such corresponding policy or policies shall be null and void.

"Tenth. The policies of insurance are issued by the Prudential and accepted by the trust company with the distinct understanding and agreement that if any of the insured within two years from the date of the policy shall commit suicide, or shall visit or travel in the Torrid Zone without the written consent of the Prudential, or shall personally engage in any specially hazardous occupation or pursuit, as mentioned in the application, then the policies of insurance upon their lives shall cease and determine, and be of none effect and void.

"Eleventh. The obligation of the Prudential to issue new policies to the trust company may be terminated at any time after thirty days' notice to the trust company.

"In witness whereof, the parties to this agreement have, by their respective presidents and secretaries, signed and delivered the same, the day and year first above written.

"[Signed]                              John F. Dryden,
                         "President Prudential Ins. Co. of America.
"[Signed]                              Edward S. Johnson,
                         "Secretary Prudential Ins. Co. of America.
"[Signed]                              J. E. McKeighan,
                         "President Missouri, Kansas & Texas Trust Co.
"[Signed]                              E. J. Davison,
                         "Secretary Missouri, Kansas & Texas Trust Co."

The answer admits that the defendant has not complied with the laws of Minnesota respecting the transaction of life insurance business in the state.

The circuit court rendered a decree canceling the mortgage. 71 Fed. 350. The defendant thereupon appealed the cause to this court.

Wm. C. White, for appellant.

J. B. Richards, for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

CALDWELL, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The case of Trust Co. v. McLachlan, 59 Minn. 468, 61 N. W. 560, involved the construction of one of the appellant's contracts identical in its provisions with the one here in suit. Judge Mitchell, speaking for the court in that case, said:

"We had supposed that in the course of our professional and judicial experience we had met with about all the forms of contract which have been devised by the

ingenuity of modern associations of this and similar kinds, but this one is entirely novel to us. It is certainly unique, and, after a careful study of all its provisions, it seems clear to us that it must have been contrived for the purpose of evading either the insurance laws or the usury laws, or both, of this state; but we shall take plaintiff at its word, and assume, without deciding, that it is not a life insurance contract, and hence that the laws of this state prohibiting and declaring invalid such contracts made by a foreign insurance company which has not complied with our statutes are inapplicable. It remains to be considered whether the facts justify the conclusion that the scheme was devised as a cover for usury. It was on this ground that the trial court held the notes and mortgage void."

And the court held that the scheme embodied in the application, notes, and mortgage was merely a colorable device to cover usury, and that the notes and mortgage were usurious and void. This judgment of the supreme court of Minnesota is directly in point in the case at bar on the question as to whether the contract is usurious.

The statutes of Minnesota fix the legal rate of interest at 7 per cent., and the highest conventional rate at 10 per cent., and declare that "all bonds, bills, notes, assurances, conveyances, chattel mortgages, and all other contracts and securities whatsoever, and all deposits of goods, or anything whatever, whereupon or whereby there shall be reserved, secured or taken any greater sum or value for the loan or forbearance of any money, goods, or things in action, than is above prescribed, shall be void," with exceptions that have no relation to this case. It is also provided that any person who has paid usurious interest may recover it back by action brought within two years after its payment, and that, "where the original holder of an usurious note sells the same to an innocent purchaser, the maker of said note or his representatives shall have the right to recover back from the said original holder the amount of principal and interest paid by him on said note." Gen. St. Minn. 1888, c. 23, §§ 1–4.

The loan was to be repaid in monthly installments. Notes were given for these installments which included both principal and interest. The payment of each monthly installment reduced the principal of the debt by the amount of the principal included therein, and it extinguished the interest on that sum. Without reciting the testimony or setting out the extended calculations of the experts, it is sufficient to say that, viewing the contract as a loan of money, the interest charged on the loan in excess of 10 per cent. is nearly $500, after allowing the appellant the cost to it of the policy of insurance on Krumseig's life taken out in its favor upon the "renewable reducing term plan" under its contract with the Prudential Insurance Company. It is immaterial what name is given to this life insurance which the appellant required Krumseig to take out in its favor as a condition of making the loan. By whatever name called, it was taken out for the benefit of the appellant, at the cost and expense of Krumseig. Allowing the cost of this insurance to the appellant to be a legitimate charge, the fact remains that the contract stipulates for a large sum in excess of 10 per cent.

It is urged that the obligation to repay the loan is contingent upon Krumseig's living, and that in the event of his death, if he has "promptly paid previous installments, and kept other conditions," the appellant is bound to "release the unpaid portion of the debt."

But, in the contingency of Krumseig's death and the release of the unpaid portion of the debt, the appellant is indemnified against loss at Krumseig's expense, for he was made to purchase the insurance for the appellant's benefit.     On this branch of the case, the supreme court of Minnesota, in Trust Co. v. McLachlan, supra, said:

"The peculiar and unusual provisions of this contract themselves constitute intrinsic evidence sufficient to justify the finding of the existence of every essential element of usury, viz. that there was a loan, that the money was to be returned at all events, and that more than lawful interest was stipulated to be paid for the use of it. The only one of these which could be seriously claimed to be lacking was that the money was not to be paid at all events, but only upon a contingency, to wit, the continuance of the life of McLachlan; but the facts warrant the inference that this contingency was not bona fide, but was itself a mere contrivance to cover usury. The mere fact that the contract has the form of a contingency will not exempt it from the scrutiny of the court, which is bound to exercise its judgment in determining whether the contingency be a real one, or a mere shift and device to cover usury. The circumstances would justify a finding that the contingency in this case was merely a colorable device to cover usury."

We concur in the views here expressed, and they find support in other cases.     Miller v. Insurance Co. (N. C.) 24 S. E. 484; Insurance Co. v. Kittle, 1 McCrary, 234, 2 Fed. 113; Insurance Co. v. Harvey, 2 McCrary, 576, 7 Fed. 805; Clague v. Creditors, 2 La. 114.

But, conceding that the notes and mortgage are void for usury, it is contended that the appellees cannot obtain the relief they seek, except upon the condition of paying or tendering the principal of the loan and lawful interest.     Undoubtedly, this is the general equity rule, but the rule has been abrogated by statute in the state of Minnesota.     Construing the statute on the subject of usury which we have cited, the supreme court of the state, upon full consideration, held that its provisions were intended to apply as well to actions brought by borrowers for relief against usurious notes or other securities as to those brought against them, in which the usury is set up by way of defense; and that in the former, equally with the latter, the note or other security, whenever its usurious character is made to appear, should be declared void, and ordered canceled and delivered up unconditionally, and without requiring the borrower to repay the lender the amount loaned, with legal interest, or any part of it.     Scott v. Austin, 36 Minn. 460, 464, 32 N. W. 89, 864, reaffirmed in Exley v. Berryhill, 37 Minn. 182, 33 N. W. 567.     This decision was pronounced in a case where the mortgagor, without paying or tendering any part of the unpaid mortgage debt and interest, brought a bill to set aside a sale to the mortgagee of the mortgaged premises under a power of sale, and to cancel the mortgage and notes, upon the ground that the contract was usurious.     The court found the contract was usurious, and thereupon rendered a decree setting aside the sale of the mortgaged premises to the mortgagee under the power of sale contained in the mortgage, and requiring the notes and mortgage to be surrendered for cancellation, and the mortgage canceled of record.     The express holding of the court was that the complainant was entitled to this relief under the statute, without paying or tendering any part of the debt or interest.     The decision is grounded solely on the statute.     The court recognizes the general rule of

equity that a maker of a usurious contract cannot maintain a bill to cancel the same for usury without first paying or offering to pay the principal sum borrowed, with lawful interest. The court holds, however, that this rule of equity is abrogated by the statute which we have cited, and that, under that statute, conveyances and mortgages made to secure a usurious contract are void, and that the statute makes it obligatory on the court, when the usury is established at the suit of the maker of the usurious contract, to annul and cancel the contract with all conveyances given to secure performance of the same, without requiring the plaintiff to pay any part of the usurious debt or interest. The judicial department of every government is the rightful exponent of its laws, and the construction placed upon the statute of Minnesota by the supreme court of the state is conclusive in this court. The judicial interpretation of a state statute by the supreme court of the state becomes, in legal effect, a part of the text of the statute itself. Bergman v. Bly, 27 U. S. App. 650, 13 C. C. A. 319, and 66 Fed. 40.

Other states have statutes similar to the Minnesota statute, among them New York (1 Pom. Eq. Jur. § 391, note 1; Bissell v. Kellogg, 60 Barb. 617) and Arkansas. The Arkansas statute is more comprehensive than the Minnesota or New York statute, in that it extends the right to have the usurious securities canceled to the vendees, assignees, or creditors of the maker of the usurious contract. It declares that every conveyance or lien given to secure a usurious contract "may be canceled and annulled at the suit of the maker of such usurious contract or his vendees, assigns, or creditors"; and, in terms, provides, that "neither the maker of the usurious contract nor his vendees, assigns or creditors   *   *   *   shall be required to tender or pay any part of the usurious debt or interest as a condition of having such contract and any conveyance, mortgage, pledge or other lien given to secure its payment or executed in furtherance thereof, enjoined, canceled and annulled, and any rule of law, equity, or practice to the contrary is abrogated." Sand. & H. Dig. St. Ark. 1894, c. 110, §§ 5086, 5088.

A further contention of the appellant is that a state statute which changes a rule of equity law is not obligatory on a federal court, and that, therefore, the statute of Minnesota providing for the unconditional cancellation of conveyances, mortgages, and other liens given to secure the payment of usurious contracts will not be given effect by a federal court of equity sitting in that state in cases where it applies. It will be conceded that, if this suit had remained in the state court where it was originally brought, the appellees would have had the benefit of the state statute. Did they lose that right by the removal of the cause into the federal court? The practice in the federal courts in suits in equity is regulated by themselves and by rules established by the supreme court of the United States under the authority of an act of congress, and are uniform throughout the United States, and cannot be varied by state laws. But the question in this case is not one of mere practice, but of substantive law. The bill seeks to cancel a mortgage on real estate situated in the state of Minnesota. The mortgage is a cloud upon

the title of the complainant, which, under the statute of Minnesota, he is entitled to have removed unconditionally. The mode of proceeding to accomplish this result is the same in the federal courts that it is in the state courts, namely, by bill in equity. The statute is not, therefore, a practice act. It abrogates a rule of equity law, and secures to the maker of the usurious securities a substantive right, which may be enforced according to the established and well-understood equity practice. It is immaterial whether this right be called legal or equitable. It is an absolute right, and one of which no court can deprive the party. Its enforcement is not dependent on the discretion of the chancellor, nor can a rule of decision based on the supposed authority of the maxim that "he who asks equity must do equity" prevail over a positive statute expressly abrogating that rule of decision. When a court of equity is called upon to deal with a right given by statute, then it accepts and acts upon that other maxim that "equity follows the law." It is not competent for any court to take from the citizen a right secured to him by a valid exercise of legislative power. "Rights," says the supreme court of the United States, "under our system of law and procedure, do not rest in the discretionary authority of any officer, judicial or otherwise." In re Parker, 131 U. S. 221, 9 Sup. Ct. 708.

In the absence of a statute, the equity rule of decision that we are considering prevails alike in the state and federal courts, and, if a statute is ineffectual to abrogate it in one court, it is not perceived why it is not equally ineffectual to abrogate it in the other, and the result would be to make a judge-made rule of law paramount to the legislative will. A rule of equity law is no more beyond legislative control than a rule of the common law. Both may be abrogated at the pleasure of the legislature. The statute was designed to make the usury laws of the state effective. It is well known that the equity rule of decision, the application of which the appellant is insisting on in this case, rendered the usury law nugatory in many cases. By taking a mortgage with a power of sale, the usurer was sure of his mortgage securities to the extent of the principal of the loan and legal interest, notwithstanding the statute declared the contract and securities void. Moreover, the Minnesota statute deals with conveyances and titles to real estate, and to the removal of clouds therefrom, and it never was doubted that the federal courts will enforce the right given by the state law in such cases, in the mode appropriate to those courts. The laws of the state in which land is situated control exclusively its alienation and transfer, and the effect and construction of instruments intended to convey it (U. S. v. Fox, 94 U. S. 315; U. S. v. Crosby, 7 Cranch, 115; Clark v. Graham, 6 Wheat. 577; McGoon v. Scales, 9 Wall. 23); and all such laws in existence when a contract in regard to real estate is made, including the contract of mortgage, enter into and become a part of such contract (Brine v. Insurance Co., 96 U. S. 627). "The state legislatures certainly have no authority to prescribe the forms and modes of proceeding in the courts of the United States; but having created a right, and at the same time prescribed

a remedy to enforce it, if the remedy prescribed is substantially consistent with the ordinary modes of proceeding on the chancery side of the federal courts, no reason exists why it should not be pursued in the same form as it is in the state courts. On the contrary, propriety and convenience suggest that the practice should not materially differ where titles to lands are the subject of investigation. And such is the constant course of the federal courts. * * * The undoubted truth is that, when investigating and decreeing on titles in this country, we must deal with them, in practice, as we find them, and accommodate our modes of proceeding, in a considerable degree, to the nature of the case, and the character of the equities involved in the controversy, so as to give effect to state legislation and state policy; not departing, however, from what legitimately belongs to the practice of a court of chancery." Clark v. Smith, 13 Pet. 195. It would be an unheard-of doctrine to say that a state statute affecting conveyances and the removal of clouds upon the title of real estate, and giving full effect to an established state policy on a subject confessedly within the exclusive domain of state legislation, should not be obligatory on a federal court held in the state in a case coming within the purview of the statute. No decision of the supreme court of the United States has been cited, and it is believed none can be found, supporting such a doctrine. Under the operation of the rule here contended for, we should have two rules of decision on the same facts, —one for the state court, and one for the federal court; the former based on a valid exercise of the legislative power of the state, and the latter based on nothing but a rule of decision of chancery courts having no legislative sanction whatever. As a result of such diverse rules of decision, each party to a suit would engage in an unseemly struggle to get into that jurisdiction whose rule of decision favored his side of the case. Indeed, this is precisely what occurred here. This case was removed from the state to the federal court in the hope that the federal court would disregard the state statute. There are a few cases in which the rule of decision in the federal and state courts may vary, but they relate to questions of general commercial law which are not dependent upon any statute. Whenever a right is given by state statute, it is obligatory on both courts to enforce it.

The insurance feature of the contract remains to be considered. To explain and define the nature of the contract, the appellant called three expert witnesses. Mr. Lunger, the actuary of the Prudential Insurance Company, in his testimony, says: "In brief, the contract is a combination of a mortgage loan payable in installments, and a life insurance policy." Mr. Stillwell, the president of the appellant company, says: "I invented the plan on which this loan was made;" and he says his invention consists in "combining the loan and the insurance into one contract." Mr. Cone, secretary of the appellant company, testifies that "the contract involved in this case is similar to a ten-year loan and a ten-year endowment policy. The borrower in this case has all of the benefits and advantages of both a ten-year loan and a ten-year endowment policy on his life, and other ad-

ditional benefits and advantages. In fact, the only difference between this contract and a straight loan and endowment policy consists in the additional and superior advantages which the borrower has, under this contract, over and above those he would have in case he borrowed money for ten years, and then insured his life for ten years on the endowment plan." Accepting the construction of this contract given by the appellant's expert witnesses, one of whom, to use his own language, "invented the plan," we must hold that the contract is, in the language of another of appellant's witnesses, "a combination of a mortgage loan  *  *  *  and a life insurance policy." Viewed as a contract for life insurance either in whole or in part, it is void for noncompliance with the insurance laws of the state of Minnesota. These laws impose numerous conditions on foreign insurance companies doing business in the state, and punish criminally the officers and agents of any insurance company doing business in the state contrary to their provisions. Gen. St. Minn. 1878, c. 34, tit. 6, §§ 291–297 (Gen. St. 1894, §§ 3167–3174).

It is admitted that the appellant did not qualify itself to do an insurance business in the state. Upon these facts, two familiar rules of decision come into play,—one, that a penalty implies a prohibition of the thing itself, on the doing of which the penalty is to accrue though there are no prohibitory words in the statute; and the other is that a court of justice will give no assistance to the enforcement of contracts which the law of the land has interdicted. Swann v. Swann, 21 Fed. 299, 306. Applying these well-settled rules to the contract of insurance, it must be held illegal and void, and such we understand to be the holding of the supreme court of Minnesota. Seamans v. Mill Co. (October term, 1896) 68 N. W. 1065. A court of equity will not require the appellees to await a suit against them on the illegal contract to which they have an absolute defense, but will relieve them by ordering the contract executed in violation of the statute to be surrendered and canceled. The remedy of cancellation is simply the equitable proceeding identical with the setting up of the illegality as a defense to defeat a recovery at law, and thus get rid of the contract as a binding executory obligation. 2 Pom. Eq. Jur. § 940. The parties in this case are not in pari delicto. The appellant is the party responsible for the contract. It must be conclusively presumed to know that it was doing an illegal act, and it induced the appellees to enter into the contract of insurance in ignorance of its illegality. The appellees had a right to presume that the appellant had qualified itself to do an insurance business in the state. Ehrman v. Insurance Co., 1 Fed. 471. Where one party to an illegal executory contract is comparatively the more innocent, a court of equity may grant him full affirmative relief by canceling the contract. 2 Pom. Eq. Jur. §§ 941, 942. The decree of the circuit court is affirmed.

THAYER, Circuit Judge (concurring). I concur in the foregoing order affirming the decree of the circuit court on the ground stated in the opinion in chief, that the loan was usurious, and that the agreement under and by virtue of which the same was made was

a mere device to cover usury. I also concur in the view that the Minnesota statute referred to in the opinion, as construed by the highest court of the state, creates a new or enlarged equitable right, which the federal courts, as well as the state courts, must enforce. Reynolds v. Bank, 112 U. S. 405, 410, 5 Sup. Ct. 213; In re Broderick's Will, 21 Wall. 503, 520; Ex parte McNiel, 13 Wall. 236, 243; Van Norden v. Martin, 99 U. S. 378; Cummings v. Bank, 101 U. S. 153, 157; Furnace Co. v. Witherow, 149 U. S. 574, 13 Sup. Ct. 936; Gormley v. Clark, 134 U. S. 338, 10 Sup. Ct. 554. I express no opinion with reference to the question whether the contract was voidable on the ground that it was entered into in violation of the insurance laws of the state of Minnesota.

SANBORN, Circuit Judge (dissenting). I dissent from the conclusion of the majority of the court in this case on the ground that "the equity jurisdiction conferred on the federal courts is the same as that which the high court of chancery in England possesses, is subject to neither limitation nor restraint by state legislation, and is uniform throughout the different states of the'Union" (Payne v. Hook, 7 Wall. 425, 430); that it "does not receive any modification from the legislation of the states or the practice of their courts having similar powers" (Green's Adm'x v. Creighton, 23 How. 90, 105); that, consequently, no act of the legislature of Minnesota could deprive the federal courts sitting in equity of the power, or relieve them of the duty, to enforce and apply the established principle of equity jurisprudence to this case, that he who seeks equity must do equity, and to require the appellees to pay to the appellant what they justly owe for principal and lawful interest as a condition of granting the relief they ask. Tiffany v. Institution, 18 Wall. 375, 385; Robinson v. Campbell, 3 Wheat. 211, 222; U. S. v. Howland, 4 Wheat. 108, 114; Suydam v. Broadnax, 14 Pet. 67; Bank v. Jolly's Adm'rs, 18 How. 503, 507; Noonan v. Lee, 2 Black, 499