## PHILBRICK et al. v. PURITAN CORPORATION.

No. 24840.   Sept. 29, 1936.

Rehearing Denied Dec. 22, 1936.

G. E. Conway and H. O. Bland, for plaintiffs in error.

Chas. L. Yancey, G. C. Spillers, Donald L. Brown, and E. M. Calkin, for defendant in error.

WELCH, J. This action was commenced in the district court of Tulsa county upon a promissory note and to foreclose a real estate mortgage given to secure the same. From a judgment and decree of foreclosure the defendants have appealed. The parties in error are referred to herein as defendants and plaintiff, respectively, as they appeared at the trial.

Plaintiff's petition was in the usual form employed in such actions, with the note and mortgage set out as exhibits. Defendants' answer admitted the execution of the note and mortgage, but sought to defeat the action upon the ground that the aforesaid instruments were "wholly void and absolute nullities in that the same are and constitute a contract of insurance; and these defendants allege that said plaintiff, the Puritan Corporation, is a foreign corporation, and that prior to the making and entering into said insurance contract the plaintiff corporation had not and did not first comply with the laws of the state of Oklahoma pertaining to insurance contracts and insurance business, having failed to obtain a permit to transact such business therein from the Insurance Commissioner, or the State Insurance Board of the State of Oklahoma, pursuant to 1923 Session Laws of Oklahoma, chapter 101, page 167, Senate Bill No. 292, and that thereby these defendants specifically alleged that they owe the plaintiff nothing."

In this connection the note sued upon contained the statement that to the principal sum of $4,000 there should be "added the payments of the premiums on the policy of life insurance representing insurance on the life of said obligor referred to in the mortgage hereinafter mentioned." There was also a provision that interest should not be charged on the premiums.

The mortgage was given to secure the above and, according to the provisions thereof, "to secure further the payment or repayment of the premiums on a policy of life insurance, application number 98354, dated the 15th day of October, 1928, issued by the Morris Plan Insurance Society on the life of _____ * * *" The mortgage further provided that the principal sum, the interest thereon, and the premiums were payable to the holder of the mortgage in 175 equal, consecutive, monthly installments of $44 each; and all premium payments were understood to be included in the principal amount of the note. There is the further provision as follows:

"That the mortgagors will take out in companies and through brokers to be designated by the mortgagee and keep in full force and effect at all times, until said indebtedness and interest and all sums, payments, and charges secured hereby shall be fully paid, said insurance on the life of the mortgagor insured, and pay, repay or

reimburse the mortgagee for the premiums on such life insurance by making the installment payments aforesaid. Such life insurance shall be payable to the mortgagee who shall have full power to assign said recited policy of life insurance to any assignee of said obligation or purchaser of the premises at any sale hereunder. The amounts paid for the premiums of said insurance shall be a further charge and lien upon the premises described in this mortgage and shall be recovered in any foreclosure suit and included in any judgment or decree rendered in any action, as aforesaid, and collected, and the lien thereof enforced in the same manner as the principal debt hereby secured.

"As additional security for the payment of the indebtedness, interest, sums, payments and charges hereby secured, the mortgagors hereby assign unto the mortgagee all that said recited policy of life insurance, and all moneys to become payable thereunder, to hold unto the said mortgagee. * * *"

A stipulation was filed wherein it was agreed that the plaintiff corporation had not complied with any of the insurance laws of the state. Thereupon plaintiff moved to discharge the jury and to try the case to the court, which motion was sustained over defendants' objections.

Upon completion of plaintiff's evidence, the court, on its own motion, rendered judgment for plaintiff upon pleadings and the evidence, which included the life insurance policy above referred to and the application therefor signed by defendant O. R. Philbrick. This action of the court is here for review.

Before considering the foregoing assignment, it becomes necessary for us to dispose of certain other alleged errors brought here by this appeal, as follows: First, the action of the court in discharging the jury; second, the order of the court overruling defendants' demurrer to plaintiff's evidence.

While the present case is one in equity and not triable by a jury as a matter of constitutional right (sec. 19, art. 2, Const.), it is an action for the recovery of money and ordinarily triable to a jury as a right granted by section 350, O. S. 1931. Here, however, the statute does not apply. The action has resolved itself into one wherein the relief sought is that which only a court of equity can grant. The amount sought to be recovered is not controverted; and the defendants, by their answer, seek equitable relief, the annulment of the instruments as constituting a contract in violation of positive law and against public policy. They do not dispute the amount of the debt, but seek to avoid payment of the whole thereof on the one ground that the contract creating the same is void. Thus, when that question is determined, nothing remains to be done except to enter judgment for the full amount claimed by plaintiff, or to deny any recovery. In such case the action is not one for the jury, for there is no issue as to the amount of recovery, and therefore does not come within the provisions of section 350, supra.

These views conform to the former expressions of this court. We held in Moore v. Stanton, 77 Okla. 41, 186 P. 466, as follows:

"Where, in an action on a promissory note and to foreclose a mortgage executed to secure payment of same, defendant admits execution of the note and mortgage, and by cross-complaint sets up a defense involving the application of equitable doctrines, and seeks affirmative relief that only a court of equity can give, such defendant is not entitled to a jury trial."

That rule applies in all respects to the question here considered. See, also, Dean v. McMichael, 168 Okla. 536, 33 P. 1086.

There is yet another reason to sustain the trial court's action in discharging the jury. The only issue brought out by the pleadings in this case was that of the validity of the mortgage contract, and, more specifica'ly, whether it was against public policy and in violation of positive law. Such question is one for the court and not for the jury. Huber v. Culp, 46 Okla. 570, 149 P. 216. There it was held:

"It is a question for the court to determine, as a matter of law, whether a contract is or is not against public policy."

Defendants insist that the intention of the parties is controlling of the question whether the contract violated the insurance statutes, and that the question of intention is for the jury to determine. They rely upon the decision in Waldrep v. Exchange State Bank, 81 Okla. 162, 197 P. 509. That was not an equity case. It was for the recovery of damages for conversion. A written instrument came in question and it was assailed on the ground of fraudulent intent of the parties, and it was properly held that the question of intent was for the jury.

We hold further that the court did not err in overruling defendants' demurrer to plaintiff's evidence. We have set out above the full purport of such evidence, especially that portion tending in any manner to favor defendants' theory of the case. In so far as the transaction may have constituted an insurance contract, the evidence merely reveals an agreement wherein the defendants agreed to insure the life of one of them as

further security for the loan. This was accomplished through what appears to be a wholly independent insurance company. We know of no law in this state prohibiting a mortgagee from requiring and accepting such an insurance policy as further security for a loan. We think, under a majority of the decisions, the plaintiff had an insurable interest in the life of defendant Philbrick (37 C. J. 395, sec. 63) to the extent of the debt, and plaintiff was made the beneficiary only to that extent.

While the insurance premiums were payable to the plaintiff, and were secured by the mortgage, plaintiff's evidence disclosed that they were remitted in full to the insurance society. We are not acquainted with any rule of law prohibiting the parties from so securing the payment of such premiums.

Defendants strongly contend that the policy issued by the Morris Plan Insurance Society was merely a form of reinsurance. They say the case of M., K. & T. Trust Co. v. Krumseig, 77 Fed. 32, is in point, and fully sustains their position. We cannot so agree. There the mortgagee shared in the profits of the insurance company by accepting a portion of the premiums paid by the mortgagor. In addition to that circumstance, officers of the mortgagee corporation admitted that the mortgage was designed as a combination loan and insurance contract.

Here the evidence of the plaintiff showed that the defendants were required to furnish life insurance with the plaintiff as beneficiary to the extent of the amount of the loan, and required that the policy be issued by a designated insurer, the premiums on such policy to be secured by the mortgage, paid direct to the mortgagee, who thereupon transmitted the same to the insurer. These facts alone are insufficient to make the mortgage transaction an insurance contract, and are insufficient to destroy plaintiff's cause of action in foreclosure. The demurrer to plaintiff's evidence was therefore properly overruled.

The evidence of the plaintiff makes out a clear case showing a right to recover. The defendants' answer admitted execution of the note and mortgage, and alleged no defense except the allegation, in substance, that the note and mortgage were void in that they constituted a contract of insurance, while the plaintiff, a foreign corporation, had not complied with the laws of the state of Oklahoma, pertaining to insurance contracts and the insurance business, and were therefore unauthorized to engage in the insurance business or make insurance contracts. The plaintiff admitted that it had not complied with the laws of the state essential to engaging in the insurance business, or entering into insurance contracts. No other facts whatever were asserted by the defendants in defense to plaintiff's action. The note and mortgage sued upon did not constitute an insurance contract, as we have heretofore seen. Therefore it was immaterial that plaintiff had not complied with the insurance laws of the state. There is no contention that the note and mortgage were illegal or invalid for any other reason. The defendants in no manner sought to amend the answer. The defendants in their opening statement at the commencement of the trial stated, in substance, that the plaintiff was generally "doing an insurance business," and referred to the details of the newspaper advertising campaign of plaintiff as indicating that the plaintiff company held itself out as engaging in the insurance business, and referred to certain attorneys at law and agents who represented both the plaintiff corporation and the insurer corporation. At the conclusion of the trial the defendants offered to prove in a general way the things stated in the opening statement, which offer was refused.

It is clear that many of the things stated in the opening statement were immaterial in view of the issue raised by the pleadings, which was purely an issue of law as to whether the note and mortgage constituted an insurance contract. It is also clear that all of the fact details mentioned in the opening statement were made in line with the defendants' assertion in their answer that defendants' contract with plaintiff was in truth and in fact a contract of life insurance. There was no allegation in the answer under which the details set out in the opening statement would be material. There was no allegation that the defendants had in any manner been misled or imposed upon by any act or statement of the plaintiff or any of its agents or representatives. There was no error in refusing the offer of proof, as they had no bearing on the single issue of law involved.

It is worthy of note that at the conclusion of the defendants' opening statement the trial judge called attention to the fact that the stated details had not been in any manner asserted in the answer, to which the defendants then replied, in substance, that they relied upon the defense asserted in the answer, thus indicating no desire to present any amendment. Since the answer presented

only the legal defense concerning the asserted or contended invalidity of the note and mortgage, and having concluded that such contention is not well taken, it follows that the trial court did not err in rendering judgment for the plaintiff, and that judgment is affirmed.

McNEILL, C. J., OSBORN, V. C. J., and BAYLESS and CORN, JJ., concur. GIBSON, J., concurs in part and dissents in part. PHELPS, J., dissents. RILEY and BUSBY, JJ., absent.

PHELPS, J. (dissenting). I respectfully dissent from the majority opinion. It appears to me that if the evidence which was offered by the defendants was not admissible under the allegations contained in the answer, as the opinion infers, it was not necessary for this court to discuss the question of whether that evidence would be sufficient to constitute the transaction a contract of insurance. It is therefore not clear to me whether on this point the court intends to overrule several of its prior decisions, among them Hunt v. W. T. Rawleigh Medical Co., 71 Okla. 193, 176 P. 410, which announced the general rule that upon being apprised in any manner germane to the proceedings that a contract sought to be enforced is violative of a statute or public policy it becomes the duty of the court to conduct an investigation of the charge, irrespective of the pleadings. Such is no doubt the rule in this state, as well as in most jurisdictions. See Hunt v. Rawleigh, supra; also 3 C. J. 742; Greenhood on Public Policy, p. 2; Palmer v. Palmer (Utah) 72 P. 3.

It is fundamental that when the violation of a statute or public policy is charged, and the court is apprised of said charge in any manner, either within or without the pleadings, and that question is material, it is the duty of the court in the proper performance of its office to determine if such charges are true. The rule goes even further, for under such circumstances the courts will often go back of even the written instruments in suit and regard the inducements thereto, and consider all of the surrounding circumstances in order to determine the question. The courts go so far as to consider also the **effect** of the contract, for the purpose of determining the question of violation of a statute or public policy, and refuse for that particular purpose to restrict themselves to the mere written provisions thereof. Therefore when the trial court was informed by the attorney for the defendants of what the charge consisted, and especially when that attorney cited the statute which should be controlling in this case, it was the duty of the court to receive and consider the evidence offered.

With all respect to my associates, I must say that the facts in the case and the legal issues involved deserve a more complete statement and discussion than that contained in the majority opinion, for if the details and progression of events in this case are analyzed in detail it seems to me that no other conclusion is possible than that the Puritan Corporation itself (entirely aside from the Morris Plan Insurance Society) entered into its own contract of insurance with the defendants, as that term is defined in our statutes. As I see it, where we have a plain and unambiguous definition provided by statute, and the facts of the case fit the definition, our duty is to recognize that fact and announce the result which the facts and the law demand.

I believe that under either of several different theories the plaintiff here entered into a "contract of insurance." The relationship of the various companies may be best imagined or illustrated in the form of an inverted triangle, with the Puritan Corporation (plaintiff) and the Morris Plan Insurance Society at the upper corners thereof, and the Morris Plan Company at the lower point of the triangle. The Puritan Corporation is a foreign corporation, licensed to do a loan and mortgage business, but not an insurance business or to make contracts of insurance in this state. The Morris Plan Insurance Society is a foreign corporation which is licensed to do an insurance business in this state. The Morris Plan Company, at Tulsa, was the agent of both the Puritan Corporation and the Morris Plan Insurance Society. The evidence does not reveal whether the Morris Plan Company was licensed to act as an insurance agent as required by section 10481 et seq., O. S. 1931, nor what relationship, if any, exists between the Puritan Corporation and the Morris Plan Insurance Society. It is undisputable, however, that there exists between them that relationship which would be imposed or created by their joint agent's acts in a transaction wherein said agent is acting for both, and for the mutual benefit of both, at the same time.

The defendants offered, and the court refused, proof that the Morris Plan Company, plaintiff's agent, in its own name, but in truth and in fact for the plaintiff, advertised extensively in the Tulsa newspapers, soliciting the general public to borrow money with which to refinance existing mortgages on homes, and thus to get rid of the burdens

imposed by those mortgages, and that "if the borrower, or a home owner, died before the loan had been repaid in full, the loan would be discharged and the mortgage released"; (it does not appear that any mention of the Morris Plan Insurance Society was made in said advertisements or representation, or that the applicant would be required to take out life insurance); that the Puritan Corporation and the Morris Plan Company each stood one-half the expense of the advertising; that when an applicant (including defendants) desired to borrow pursuant to the advertisements and representations, he approached the Morris Plan Company and that company only, and was directed to sign an "agency agreement" appointing that company his agent to procure the identical loan advertised, but that afterward he was required to take out life insurance in favor of plaintiff before the loan was made, and was required to be examined by a certain designated physician; that the Morris Plan Company "handled the whole deal" for the Puritan, including the collections and the foreclosure, that this was not merely an isolated transaction but that several hundred such deals had been made during that year.

It cannot consistently be contended that the Morris Plan Company was thus engaged in its own business enterprise and that its general agency for the Puritan Corporation did not begin until the Puritan made the loan, for we must not forget that in the assumed state of facts the Puritan was at least 50 per cent. responsible for the advertising campaign, had full knowledge thereof, defraying half the expenses thereof and certainly expecting to profit therefrom; that from plaintiff's own evidence the Morris Plan Company collected all installments, including insurance premiums, which were sent to plaintiff, and generally had charge of the affair; that in the Puritan's mortgage form it required defendants to use "brokers to be designated by the mortgagee."

A reasonable inference is as valuable as the facts upon which it is founded. The irresistible conclusion is that when the defendants, husband and wife, as a part of the general public, accepted the attractive offer which was held forth in the advertisements and entered the office of the plaintiff's agent and there signed the agreement appointing the Morris Plan Company their "agent" to procure the loan (in which agreement there was no mention whatsoever of requiring insurance and in which defendants agreed to pay the Morris Plan Company

$235 for "procuring" the loan), the prime impelling motive was the insurance feature of the offer, though no mention of insurance or premiums, as such, had been made, either in the advertisements or the "agency agreement." Here was the assurance that if he should die his widow would not be rendered homeless and indebted to the present mortgagee or to the intended mortgagee, the plaintiff. In other words, in the language of our statute defining insurance contract (sec. 10452, O. S. 1931), having accepted the offer and having promised to pay plaintiff's agent $235 for "procuring" the loan, and to mortgage his home, here was "an agreement by which one party, for a consideration, promises to * * * do an act valuable to the assured, or to procure others to do an act * * * which action is valuable to the assured, upon the * * * death of" the husband.

I pause here in the narration of facts to observe that the foregoing, if true, in and of itself, without at all considering the subsequent life insurance policy and the premiums to be paid thereon, constituted a contract of insurance. This is true in spite of the fact that the Morris Plan Insurance Society had not as yet logically been brought into the case, and would be true if it had never been brought into it, or if no written insurance policy had ever been issued by it or any other insurance society. The statutory definition is plainly applicable. The state of Massachusetts had a statutory definition almost identical with ours; its Supreme Court had the following situation to analyze, in Attorney General ex rel. Monk v. C. E. Osgood Co., 144 N. E. 371, 35 A. L. R. 1037. A furniture company advertised: "In case of death we cancel your debt. Should a purchaser of Osgood Furniture die, we give a receipted bill on unpaid accounts." No insurance was mentioned by the advertising dealer, nor did it take out any policy or require the purchaser to do so. Yet, in holding that the transaction constituted insurance, the court said:

"This constitutes insurance within the meaning of the statutory definition. The cancellation of the debt is the equivalent of the payment of money to the estate of the customer. The transfer of title to the personal property delivered on lease is a right valuable to the customer. The cancellation of the debt and the transfer of title to the personal property spring out of the agreement, and are in performance of its terms. The customer pays to the defendant the consideration for the doing of these things in the money handed to it as deposit and as the partial payments made from time to

time. The cancellation of the debt and the transfer of the title to the personal property occur upon the death of the customer. That loss of his life is plainly something in which the customer has an interest. Every element of the statutory definition of insurance is present. Whether this clause in the contracts of the defendant is ancillary to its chief business or is mainly for advertising ends is not relevant in view of the absolute prohibition in Gen. Laws, chap. 175, § 3, against the making of contracts for insurance except by companies and in the manner authorized by law. This prohibition is sweeping. It is not subject to exceptions. It is conceded that the defendant is not authorized to make contracts of insurance. Therefore it has violated the statute."

In State v. Beardsley, 92 N. W. 472, the Minnesota court applied a statutory definition similar to our own, where a "home building" plan was involved; in the contract no mention was made of insurance, the arrangement being that the subscriber should make certain monthly payments for a stipulated time, upon which the company's lien for building his home should expire, but that if in the meantime he should become totally and permanently disabled, the lien should be discharged. It was held to be a contract of insurance, and the court said:

"The real character of such a contract, and the acts to be performed under it, cannot be concealed or changed by the use or absence of words in the contract itself. It is immaterial that such a contract does not, on its face, purport to be one for insurance."

In National Sales Co. v. Manciet (Ore.) 162 P. 1055, it was held that a contract by which the plaintiff sold merchants certain prizes and a voting outfit, and agreed that if the merchants' business did not total a certain amount during the succeeding year the plaintiff would pay them the deficiency in cash, was a species of commercial insurance. An analogous case reaching the same result is United Securities Life Ins. & Trust Co. v. Bond, 16 App. D. C. 579.

Even though plaintiff is not classified as an insurance company, it is "the character of the business transacted and not the mere formal working of the organization" which fixes its true status. Modern Order of Praetorians v. Bloom, 69 Okla. 219, 171 P. 917. So that fact does not render it immune to the insurance laws.

The benefits to be received by assured may be either at the present or in the future, or both, as in the present case. If they are received at the time of the execution of the contract, it is called "advance insurance." Somewhat in point is 37 C. J. 363:

"A contract with an insurance company by which insured in consideration of a gross sum paid to him in advance by the company agrees to pay to the company certain specified periodical payments **for a term of years or for life only**, if life should terminate within that period, the making of such payments being secured by a bond and deed of trust or mortgage on real property with no provision for repayment of the principal sum in any event is a form of life insurance. The same is true of other contracts of a like character."

It is obvious from the face of the foregoing excerpt, and from the cases cited in support of it, that the words "in any event" were used as synonymous with "at all events." This is sufficient for this phase of the case. It is apparent, from the statute and the reasoning of the above cases, which seem perfectly sound, that this discussion could be ended here, because **regardless of whether the written insurance policy should be subsequently issued or not issued**, the offer to cancel the debt on the death of the borrower, and the defendants' acceptance and parting with consideration or suffering detriment, or both, thereunder, constituted a contract of insurance. The subsequent issuance of the policy does not alter the fact that a contract of insurance had **already** been made. Therefore, whether we consider the policy as having grown out of the original contract of insurance (the one which we have been discussing), or as the result of a separate and distinct transaction between the defendants and insurance society alone, as contended in plaintiff's brief, the results are the same. If separate and distinct (with which analysis I am not inclined to agree), that would not erase the fact that nevertheless the plaintiff, by the representations, conduct, and acceptance of consideration hereinbefore discussed, or if no acceptance of consideration, then detriment to the borrower, **also** entered into its **own** "contract of insurance." Rather than erase the fact, it aggravated it, as will hereinafter appear. I now discuss the second phase of this case, and resume the statement of facts:

In logical contemplation, the next instrument executed was the application for mortgage loan. A very gradual departure from the sense of the advertisements may now be observed; for, though the instrument is long, still no mention is made of life insurance, or life insurance premiums, as such, the three words "and protection cost" being inserted in a paragraph wherein the borrower promises to repay the loan with interest, etc., although an entire paragraph is devoted to "fire insurance and such other property in-

surance as may be required by the lender in such amounts as the lender may prescribe."

Nearly a month after execution of the above instruments, during which time it may be presumed that the borrower was bringing his abstract to date, and the plaintiff's attorney was examining it at the borrower's expense, as per the agreement (and without any presumption, for the record does not show, whether the borrower had yet paid the $235 to the plaintiff's agent for "procuring" the loan), the loan was approved and the mortgage and note were executed, wherein, for the first time, it becomes really apparent that in case of the mortgagor's death the plaintiff will "cancel" the indebtedness only because of life insurance to be additionally paid for by the mortgagor, for the benefit of the mortgagee. So, after all, there is to be no real "cancellation," as we started out to believe, but cancellation only by full payment of the debt; and, facing the facts, the mortgagee's apparent magnanimity has been nothing but a decoy to sell the mortgagor not only a loan but a life insurance policy as well. All of which may be legal, but not, in my opinion, if the mortgagee is not licensed to do an insurance business. The fact that a licensed insurance company did in fact ultimately issue the policy does not change the situation, as will be seen further on.

As a result of the transaction the plaintiff made the loan and the defendants executed their note and mortgage, in both of which they were required to not only repay the principal amount, with interest, but also regular life insurance premiums, considered a part of the principal, **to the plaintiff** (not to the insurance company), and these premiums were constituted a lien upon the property, so that default in their payment could cause a foreclosure, even though the mortgage company had not first paid the premium itself. The Morris Plan Company collected the premiums as a part of the regular monthly installments, forwarded them to the plaintiff, and then the plaintiff paid the insurance society. Further, the mortgage provided that the plaintiff should have the right to name the insurance company, and also the broker. The plaintiff did name the Morris Plan Insurance Society, for that company issued its policy on defendant husband's life and, as immediately as it had entered, ceased to be an actor in the chain of facts, although when the petition was filed there were eight monthly insurance premiums unpaid. The mortgage and the petition call for an attorney's fee of 10 per cent. of the amount due, which includes the delinquent premium payments on the insurance policy.

When the policy was issued by the Morris Plan Insurance Society, upon the application which was required of defendant, the first beneficiary named therein was the Puritan Corporation. The amount payable upon the death of Philbrick was to decrease annually, so that it equaled, each year, the amount which on that year would represent the balance on the unpaid mortgage. Therefore, naming Philbrick's wife as second beneficiary after payment of the indebtedness to the Puritan, would not likely be of any practical effect as life insurance, for there would be no surplus unless the mortgagors themselves accelerated the payments. The life insurance feature is so thoroughly incorporated into the note and mortgage that it would require too much space to copy all of the interlocking features herein.

The underlying idea or plan here used by plaintiff appears to have been somewhat in vogue about 30 years or more ago, but in another form. These contracts were then attacked on the ground used in the instant case, and also as being usurious. It is unnecessary in this opinion to consider the question of usury, but the usury cases do help solve the particular question before us.

The contract in the instant case is strikingly similar to the one involved in M., K. & T. Trust Co. v. Krumseig, 77 Fed. 32, wherein it was held that regardless of what the parties called it, it was a contract of life insurance. The court said:

"The insurance feature of the contract remains to be considered. To explain and define the nature of the contract, the appellant called three expert witnesses. Mr. Lunger, the actuary of the Prudential Insurance Company, in his testimony says: 'In brief, the contract is a combination of a mortgage loan payable in installments, and a life insurance policy.' Mr. Stillwell, the president of the appel'ant company, says: 'I invented the plan on which this loan was made;' and he says his invention consists in 'combining the loan and the insurance into one contract.' Mr. Crone, secretary of the appellant company, testifies that 'the contract involved in this case is similar to a ten-year loan and a ten-year endowment policy. The borrower in this case has all of the benefits and advantages of both a ten-year loan and a ten-year endowment policy on his life, and other additional benefits and advantages. In fact, the only difference between this contract and a straight loan and endowment policy con-

sists in the additional and superior advantages which the borrower has, under this contract, over and above those he would have in case he borrowed money for ten years, and then insured his life for ten years on the endowment plan.' Accepting the construction of this contract given by the appellant's expert witnesses, one of whom, to use his own language, 'invented the plan,' we must hold that the contract is, in the language of another of appellant's witnesses, 'a combination of a mortgage loan * * * and a life insurance policy.' Viewed as a contract for life insurance either in whole or in part, it is void for noncompliance with the insurance laws of the state of Minnesota. These laws impose numerous conditions on foreign insurance companies doing business in the state, and punish criminally the officers and agents of any insurance company doing business in the state contrary to their provisions. Gen. St. Minn. 1878, c. 34, tit. 6, §§ 291-297 (Gen. St. 1894, §§ 3167-3174). It is admitted that the appellant did not qualify itself to do an insurance business in the state. Upon these facts, two familiar rules of decision come into play,—one, that a penalty implies a prohibition of the thing itself, on the doing of which the penalty is to accrue though there are no prohibitory words in the statute; and the other is that a court of justice will give no assistance to the enforcement of contracts which the law of the land has interdicted. Swann v. Swann, 21 Fed. 299, 306. Applying these well-settled rules to the contract of insurance, it must be held illegal and void, and such we understand to be the holding of the Supreme Court of Minnesota. Seamans v. Mill Co. (October term, 1896) 68 N. W. 1065."

Although in the foregoing case the trust company itself obtained the insurance on the life of the mortgagor, and in the instant case the mortgagor was required to apply for the insurance, there is no proper legal distinction between the cases, for here the Puritan Corporation reserved the right to name the insurance company and the insurance broker, which accomplished the same result. In both cases the mortgagor was obligated to pay the insurance premiums to the mortgagee, instead of the normal method of paying it to the insurance company. In both cases the amount of insurance payable at death decreased annually in exact step with the annually decreasing mortgage indebtedness; in both cases mortgagor was required to pass a medical examination. In the instant case the insurance application, by number, is expressly referred to, in the mortgage, said mortgage as thoroughly securing payment of the premiums as the original debt itself.

The plaintiff contends that the Krumseig Case is not in point because "in no event was the estate or a named beneficiary to receive any sums of money upon the death of the mortgagor." I fail to perceive what connection that has with the question, which is whether the transactions amounted to a contract, or possibly two contracts, of insurance. Nor do I see why the fact that in that case the mortgagee received a small portion of the premium should render the decision inapplicable here, for that decision was not based at all upon that fact. The case, in my opinion, is exactly in point, and if there are any decisions contrary to it, or criticizing it or the other authorities cited herein, my research has not disclosed them, and the plaintiff has not cited them.

In Krumseig v. M., K. & T. Trust Co, 71 Fed. 350 (notice different citation) the same result was reached, the court remarking:

"The undoubted purpose of the defendant (trust company) was to loan money, and at the same time secure, as far as possible, indemnity against loss to itself, at the expense of the borrower. * * * Complainants could not have obtained the loan without submitting to this feature of the contract."

The Supreme Court of Minnesota, in M., K. & T. Trust Co. v. McLachlan, 61 N. W. 560, had a case before it wherein the plaintiff corporation had never complied with the state law regarding permits to transact life insurance business, to which corporation the defendant made application for a loan of $9,000, to be secured by a mortgage on her real estate. The application contained a provision that the notes to be executed would cover principal, interest, and "cost of guaranty to cancel the debt in case of death," and should be secured by a mortgage; she further agreed to pass a medical examination prescribed by the company. When the plaintiff attempted foreclosure it was held that the arrangement was nothing but a cloak for usury; however, the insurance feature is applicable in the instant case, by the following language of the court:

"We had supposed that in the course of our professional and judicial experience we had met with about all the forms of contract which have been devised by the ingenuity of modern associations of this and similar kinds, but this one is entirely novel to us. It is certainly unique, and after a careful study of all its provisions it seems clear to us that it must have been contrived for the purpose of evading either the insurance laws or the usury laws, or both, of this state."

It may be admitted that the insurance company which issued the written policy of insurance was licensed to do an insurance business in Oklahoma. But the policy is not the question. The question is a bigger one than that. The question is whether the plaintiff

also was engaged in making insurance contracts. If the defendant's offer is true, then the plaintiff entered into an insurance contract before the policy, or the insurance society, was ever mentioned. And then, next, the plaintiff, through its agent, executed a contract of insurance when, for a consideration, it "promised to procure others," and did "procure others," to pay money or its equivalent or to do an act valuable to the assured upon the loss of his life. Section 10452, O. S. 1931, plainly states that:

"A contract of insurance is an agreement by which one party, for a consideration, promises to pay money or its equivalent or to do an act valuable to the assured, or to procure others to do the act * * * which action * * * is valuable to the assured * * * upon the * * * death of said party, and it shall be unlawful for a company to make a contract of insurance upon * * * lives in this state * * * or for any person as insurance agent or insurance broker to make, negotiate, solicit or in any manner aid in the transaction of such insurance except as authorized by the laws of this state."

The Puritan Corporation cannot escape the legal effect or disclaim liability for the advertising offer of its own agent, the Morris Plan Company, to the effect that the death of borrowers would cancel the indebtedness. If the Morris Plan Company was the Puritan's agent for soliciting loans, it was the Puritan's agent in the representation that death would cancel the debt. Thus, in response to the Puritan's activities, the applicant enters the office of the Morris Plan Company and signs the application for a loan: consequently the Morris Plan Company is the agent of the Puritan, regardless of whether that fact is revealed on the printed form of application. But during that brief time, later on, which is consumed in filling out the insurance application, the Puritan would say that the Morris Plan Company was not its agent but was the agent of the Morris Plan Insurance Society, the insurer. Thus we would have a peculiar form of shifting agency, with the Puritan controlling the shift. The contention overlooks the fact that when the agent superintended the execution of the insurance application, as an incidental duty, he was causing compliance with the requirement of the loan application and therefore was agent for the mortgagee and the insurance society, both at the same time. The Puritan's agent's acts are the Puritan's acts; therefore when the agent advertised that the debt would be canceled by death, and the Puritan entered into this plan and paid a part of the expenses of the advertising campaign, and reaped the benefit therefrom, the Morris Plan Company was acting for the Puritan Corporation, even though the Puritan may have been an undisclosed principal.

The digests are virtually devoid of cases revealing this plan of selling insurance during the last 25 or 30 years. One is strongly inclined to agree with the defendants' observation, concerning the transaction in suit, that "Though very cleverly worded, it is but an old scheme in a new dress, and falls clearly within the principles of the cases" governing such insurance.

I desire to emphasize that the licensing of the Morris Plan Insurance Society to do business in this state has little or nothing to do with the question here involved, nor does the fact that Philbrick's widow would have taken the property free and clear of the mortgage if Philbrick had died have anything to do with it. The controlling question here is whether our statute defining insurance contracts means what it very plainly says, and whether, under that definition and the uniform rulings of the federal courts and the courts of our sister states, the transaction effectuated by the plaintiff constituted "a contract of insurance." I believe that it did, under either or all of the three theories hereinbefore discussed.

I have no inclination to forbid or criticize the right of a mortgagee to demand additional security in the form of life insurance as a condition precedent to his making a mortgage loan,—which is an entirely different question. But if that mortgagee, in addition to his mortgage and loan business, desires to enter the insurance business he should comply with the insurance laws, as do others in that business, or be ready to face the consequences when that fact is brought to the attention of the courts.