[No. 10902. Department One. May 6, 1913.]

MARION G. LAY, *as Administratrix etc., Appellant,* v. E. F. BOUTON *et al., Respondents.*[1]

USURY—UNLAWFUL EXACTIONS—CONTRACTS—CONSTRUCTION. There was an obvious evasion of Rem. & Bal. Code, § 6251, prohibiting usury, where it appears that plaintiffs, having contracts for the purchase of land, borrowed $2,000 from the defendants on the security of the contracts, agreeing to repay the amount and interest on a certain date, and if not so paid, to pay the balance due and moneys advanced for taxes and liens, "either in cash or in lots at the agreed valuation of $50 per lot" which was much less than the value of the lots, and later a second contract was made, reciting a settlement whereby the defendants advanced the sum of $2,098 to complete payment for the land, and received ten lots of the value of $250 each and notes aggregating $6,098, at a time when but $4,098 was due them on the original contracts and the advances, and making a bonus of $2,500 in land and $2,000 in notes, claimed by them on the theory that it was a "profit sharing" transaction.

SAME — UNLAWFUL INTEREST — APPLICATION — JUDGMENT. Under Rem. & Bal. Code, § 6255, providing that judgment in an action on a usurious contract, shall be for the principal less twice the amount of interest paid, there can be no recovery where the value of lots, exacted as interest, when doubled, exceeded the principal.

Appeal from a judgment of the superior court for Clarke county, McKenney, J., entered April 30, 1912, in favor of the defendants, after a trial before the court, in an action for equitable relief. Reversed.

*Miller, Crass & Wilkinson,* for appellant.

*McMaster, Back, Hall & Drowley* and *Jas. P. Stapleton,* for respondents.

GOSE, J.—This is a bill in equity for an accounting and other equitable relief. The plaintiff, John M. Lay, died pending the action, and Marion G. Lay, as administratrix of his estate, was substituted as plaintiff. She has appealed from an adverse judgment.

[1]Reported in 131 Pac. 1153.

The litigation arose out of two contracts made between John M. Lay and his wife, Marion G. Lay, and the respondents. The first contract was entered into on the 8th day of January, 1910. It recites that John M. Lay has a contract with one Hoff and his wife for the purchase of certain real estate situate in Clarke county, this state, bearing date June 23, 1908; that the property had been platted as "Minnehaha Park Addition;" that he also had a contract with one Knowles and wife, bearing date September 29, 1909, for the purchase of a tract of real estate known as Knollwood, situate in the same county; that Lay desired to "borrow" $2,000 from the respondents, the "loan" to be secured by an assignment of these contracts to them, and that, in consideration of the agreement and the sum of $2,000, the receipt of which was acknowledged, they sold and assigned all their right, title and interest in the two contracts, and to any and all contracts for the sale of lots or portions of the tracts designated. It was agreed therein that the respondents should take charge of, and direct the sale of, lots in Minnehaha Park addition, subject to the provisions of the Hoff contract; that if the Hoffs had been paid in full "the $14,000 which they are to receive," before June 23, 1910, according to the terms of their contract, then the respondents might sell such lots as had not been sold "at such prices as they may fix," but at not less than $100 a lot, the first $100 paid upon each lot to be applied in payment of the loan of $2,000, the balance, if any, in excess of that sum for each lot sold prior to June 23, 1910, to be retained by the respondents as interest "on said loan and compensation for their services." It was further stipulated that the respondents at their option might at any time settle in full with the Hoffs, and that whatever sum was paid in the settlement should "become a part of the consideration for this agreement." The contract also provided that the respondents might purchase all sale contracts at a discount of ten per cent of their face value, the balance to be applied in

payment of their advances to the Hoffs.  It was also agreed
that:

"The balance due to said parties of the second part [the
respondents] on account of this agreement, either on account
of the original loan of $2,000, on account of the amount paid
to said Hoffs, or on account of any payments of taxes or
liens of any nature against said 'Minnehaha Park Addition,'
or said 'Knollwood,' which shall not have been paid to said
parties of the second part in accordance with the provisions
hereinbefore contained, shall be paid on June 24th, 1910, to
said parties of the second part as they may elect, either in
cash or in lots to be by them selected from the 'Minnehaha
Park Addition' at the agreed price of $50 per lot,"

except certain enumerated lots the prices of which were fixed
at fifteen dollars each.  The contract concludes with the stipu-
lation that, if the lots in Minnehaha Park Addition remain-
ing unsold on the 24th day of June, 1910, were not sufficient
to repay the respondents at the prices agreed upon, then they
should retain all the right, title and interest of the Lays in
Knollwood and to all contracts for the sale of lots therein.

On July 20, 1910, they made a second contract, reciting
that the respondents had upon that day taken title to certain
lots in Minnehaha Park addition to the city of Vancouver;
that there was due the respondents, for "money advanced
and services rendered, an amount mutually agreed to be $6,-
098.70;" that they should accept two notes of John M. Lay
in equal amounts, due one year from date, with interest at the
rate of eight per cent per annum after six months from that
date; that Lay should sell the property, provided that no lot
should be sold for less than $200; that all money derived from
sales should be applied in payment of the notes until they
were liquidated, less five per cent to be allowed to Lay as a
commission; that if the notes had not been paid at maturity,
the respondents might sell any of the remaining lots for
"their reasonable cash value;" that the notes should be a first
lien on all unsold property and all contracts for sale of prop-
erty in both additions.  This contract further provided that

the respondents "during the life of the trusteeship" should, after they had been paid, pay certain enumerated claims out of any moneys coming into their hands from sales of property.

It will be observed that the first contract provides for two contingencies, and gives the respondents two option privileges. The first is that, if the Hoffs have been paid prior to June 23, 1910, the respondents may up to that date sell lots at a price fixed by them, but not less than $100 each, and have the excess, if any, as interest on the $2,000 loan. The second is that the balance due the respondents on June 24,. 1910, both upon the original loan and on account of money paid to the Hoffs and for taxes and liens upon both tracts, shall be paid on that date "either in cash or in lots to be by them selected from the Minnehaha Park addition at the agreed price of $50 per lot," except certain enumerated lots which they had the option to take at fifteen dollars each. At the time the first contract was made, the respondents loaned Lay $2,000, and took his non-interest bearing note therefor. On the 23d day of June, 1910, they advanced $2,098, the amount required to pay the Hoffs the balance due upon their contract. There were no other advancements for the Lays. So the situation on the 20th day of July, 1910, was this: The respondents had loaned Lay $2,000 at the time the first contract was made, and $2,098 on June 23 following, making in the aggregate $4,098. On the date last mentioned, the Lays conveyed to the respondents ten lots of the value of $250 each, and gave them two notes aggregating $6,098, thus making a bonus of $2,500 in property and $2,000 in notes.

The appeal presents a single question; i. e. were the contracts usurious. The rule adopted by the courts in construing contracts is that, where a contract is fairly open to two constructions, the one lawful and the other unlawful, the former will be adopted. The circumstance conferring the right to exercise the first option did not arise. Hence it has

no bearing on the case except as it may tend to throw light upon the second option clause. It is obvious, we think, that when the first contract was made, the respondents considered the lots worth more than $100 each; for if they did not sell for a greater price, they would receive no compensation for the loan. Measured by this valuation—and all the circumstances indicate that they then had even a greater value— the privilege of selecting lots at $50 each in lieu of cash was an obvious evasion of the usury statute. Rem. & Bal. Code, § 6251, provides that, "no person shall directly or indirectly take or receive in money, goods or things in action, or in any other way, any greater interest, sum or value for the loan or forbearance of any money, goods or other thing in action than twelve per centum per annum." The books are replete with cases where artful contrivances have been resorted to whereby the lender is to receive some advantage or thing of value beyond the repayment of the loan with lawful interest. These evasions are almost infinite in variety. The courts, however, have been vigilant in unmasking the transaction and finding its real purpose, and wherever, when exposed to the light, it is apparent that there has been a shift or a device to evade the statute, the transaction has been condemned as usurious.

"When the payment of full legal interest is subject to a contingency wholly or in part so that the lender's lawful profit is put in hazard, the interest so contingently payable need not be limited to the legal rate, providing the parties are contracting in good faith and without intention to avoid the usury statutes; and the same rule governs where only part of the legal interest is in hazard. This rule finds its most frequent application in respect of loans stipulating for the payment of a portion of partnership profits in lieu of interest." 39 Cyc. 952.

The same view is thus tersely stated in *White Water Valley Canal Co. v. Vallette*, 62 U. S. 414:

"Where there is a loan, although the profit derived to the lender exceeds the legal rate, yet if that profit is contingent

or uncertain, the contract, if *bona fide* and without any design to evade the statute, is not usurious."

The contingency, however, must be more than a nominal or a colorable one. As was said in *Missouri, K. & T. Trust Co. v. McLachlan*, 59 Minn. 468, 61 N. W. 560:

"The mere fact that the contract has the form of a contingency will not exempt it from the scrutiny of the court, who are bound to exercise their judgment in determining whether the contingency be a real one, or a mere shift and device to cover usury."

Where the borrower, in order to obtain an extension of time in which to pay his debt, was required to buy horses from the lender at prices largely in excess of their value, the sale was treated as a subterfuge to compel payment of an unlawful rate of interest. *Kommer v. Harrington*, 83 Minn. 114, 85 N. W. 939. So where the lender required the borrower to take out insurance, and the compensation exacted exceeded the lawful rate of interest plus the reasonable cost of the insurance, the transaction was held usurious. *Missouri, K. & T. Trust Co. v. McLachlan, supra; Missouri, K. & T. Trust Co. v. Krumseig*, 77 Fed. 32; *Bower v. Life Ins Co.*, 86 Fed. 748. So where there has been an exaction in excess of the lawful rate of interest in the form of a commission or for pretended services, the purpose to evade the statute being patent, the contract has been treated as usurious. *Dayton v. Dearholt*, 85 Wis. 151, 55 N. W. 147; *France v. Monro*, 138 Iowa 1, 115 N. W. 577, 19 L. R. A. (N. S.) 391; *Horkan v. Nesbitt*, 58 Minn. 487, 60 N. W. 132. The same view has been taken where an excessive and certain profit has been agreed upon in lieu of interest. *Riley Co. v. Sears & Co.*, 154 N. C. 509, 70 S. E. 997.

The respondents contend, in effect, that the first contract was a profit sharing one; that the value of the property was uncertain; that they had the right when the second contract was made to demand the conveyance of eighty-two lots at $50 each, and that they took a bonus of ten lots and $2,000 in

lieu of this privilege. The respondent Adams admitted upon the witness stand that, at the time the second contract was made, lots in Minnehaha Park addition were selling on the installment plan at $250 each, but he said that he did not put that value upon them. He made no further statement as to their value at that time. The second contract was less ingenuous than the first. It recites that the $6,098 was due "for money advanced and services rendered." This was not true. There was $4,098 then due, and no services of any appreciable value had been rendered.

The respondents, among other cases, have cited *Scripps v. Crawford*, 123 Mich. 173, 81 N. W. 1098; *Duffy v. Gilmore*, 202 Pa. 444, 51 Atl. 1026; *Duval v. Neal*, 70 Miss. 288, 12 South. 145. In the *Scripps* case, it was held that an agreement by a surviving partner to pay the administrator of the estate of the deceased partner the value of the estate's interest in the partnership property as shown by the inventory, and one-half the net profit that should be earned for five years, for the one-half interest of the deceased in the partnership property and the good will of the business, was not usurious, although the one-half of the net profits exceeded the lawful rate of interest. The agreement stated that the one-half of the net earnings was "as interest on said loan and compensation for the good will of the estate in the business." The court said that there was nothing to show that either party understood that an unlawful rate of interest was contemplated. In the *Duffy* case, the court held that, where partners contribute to the capital of the firm in unequal parts, an agreement between them that in distributing the profits at the end of each year one should pay to the other "Ten per cent interest on the difference in their capital," was not usurious. This was put upon the ground that the exaction was not for interest properly so called, but for a share of the profits. In *Duval v. Neal, supra*, it was held that, where an advancement is made to promote an enterprise, the consideration being a half interest in any net profits that may spring from the venture,

the advancement with lawful interest to be returned if the requisite funds shall ever arise in the prosecution of the enterprise, the contract was not usurious. In that case both the principal and interest were risked upon the success of the venture.

Whether the contracts be viewed standing alone or as supplemented by the parol evidence, there can be no escape from the conviction that they were not *bona fide* and without design to evade the statute, but the view is compelling that there was a studied attempt to circumvent the statute and to exact from the borrower a contract which in all reasonable probability would, and which as a matter of fact did, result in more than 100 per cent interest. The statute, Rem. & Bal. Code, § 6255, provides that:

"If interest shall have been paid, judgment shall be for the principal less twice the amount of the interest paid, and less the amount of all accrued and unpaid interest."

The lots of the value of $2,500 were taken as interest, and this, when doubled as the statute commands, pays the amount actually due the respondents on the second contract.

The judgment is reversed, with directions to take an accounting between the parties after giving this credit, determine the status of the trusteeship respecting the enumerated claims, and to otherwise proceed in harmony with the principles of equity.

CROW, C. J., MOUNT, PARKER, and CHADWICK, JJ., concur.