### RINGER v. VIRGIN TIMBER CO.

(District Court, E. D. Arkansas, W. D. April 8, 1914.)

1. Usury (§ 115*)—Usury as Defense—Evidence.

In support of the defense of usury, parol evidence is admissible although it varies or adds to the written contract.

[Ed. Note.—For other cases, see Usury, Cent. Dig. § 326; Dec. Dig. § 115.*]

2. Usury (§ 16*)—Usurious Transactions—Devices as Cover for Usury.

If a transaction was in substance merely a device to evade the usury laws, the defense of usury will be sustained, regardless of the form of the contract or of the language used in the negotiation as descriptive of the transaction.

[Ed. Note.—For other cases, see Usury, Cent. Dig. § 30; Dec. Dig. § 16.*]

3. Usury (§ 31*)—Usurious Transactions—Purchase and Sale of Property Under Agreement.

The owners of the stock of a lumber company against whose property, consisting of a large sawmill, timber lands, and a short-line railroad, a foreclosure suit was pending, applied to the real complainant herein, which was a realization company, for a loan with which to redeem from the mortgage. They were told that under its charter complainant could not lend money, and that its business was to buy property, largely that of insolvents, and sell again at a profit. After negotiations, it was agreed that complainant would buy in the property at foreclosure sale, if it could be purchased for $450,000, and resell the same to a new company to be organized, taking its notes therefor, secured by mortgage on the property for $597,000, which was about $75,000 in excess of lawful interest on the money actually advanced. This agreement was carried out, except that the notes and mortgage were for $750 more than agreed, which was admittedly to cover interest for the few days before the new notes were given. Complainant had no experience in the lumber business and would not have bought the property except for the agreement. *Held,* that the transaction was in substance a loan of money and was usurious; the exaction of the $75,000, ostensibly as a profit, being merely a device to cover the taking of usurious interest.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 74, 78–81; Dec. Dig. § 31.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. USURY (§ 83*)—USURY AS A DEFENSE.

That the maker of usurious notes is a corporation which has no property beyond that mortgaged to secure the notes, or even the fact that such property is insufficient in value to pay the debt, does not relieve the notes of their usurious character nor deprive the corporation of the right to plead the usury as a defense.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 163–166; Dec. Dig. § 83.*]

5. USURY (§ 2*)—WHAT LAW GOVERNS—PLACE OF PAYMENT.

Where notes were executed in Arkansas and secured by mortgage on property in that state, but were payable in Chicago, where the payee resided and carried on its business, the notes were governed, as to the question of usury, by the law of Illinois.

[Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 2–15, 418; Dec. Dig. § 2.*]

In Equity. Suit by Jacob Ringer, as trustee, against the Virgin Timber Company. Decree for complainant, less deduction for usury.

Rose, Hemingway, Cantrell & Loughborough, of Little Rock, Ark., for plaintiff.

Moore, Smith & Moore, of Little Rock, Ark., for defendant.

TRIEBER, District Judge. This is an action to foreclose a deed of trust in the nature of a mortgage executed by the defendant to secure the payment of certain notes of the defendant, payable to A. B. Newman, which notes it is alleged in the complaint were executed for the purchase money of the property conveyed by the deed of trust. The defense is that the indebtedness is tainted with usury and is therefore, under the Constitution and laws of the state of Arkansas, void. The notes were executed in the state of Arkansas, and made payable at the office of the payee, A. B. Newman, in the city of Chicago, where he resides and carries on his business.

Article 19, § 13, of the Constitution of the state of Arkansas, is as follows:

"All contracts for a greater rate of interest than ten per centum per annum shall be void as to principal and interest, and the General Assembly shall prohibit the same by law, but when no rate is agreed upon the rate shall be six per centum per annum."

In pursuance of this constitutional provision, the first General Assembly of the state of Arkansas which met after the adoption of the Constitution in 1874 enacted a law regulating the rate of interest on contracts. The provisions of that act applicable to the issues in this case, as digested in Kirby's Digest of the Statutes of Arkansas, are as follows:

"Section 5379. When no rate of interest is agreed upon, the rate shall be six per centum per annum.

"Section 5380. The parties to any contract, whether the same be under seal or not, may agree in writing for the payment of interest not exceeding ten per centum per annum on money due or to become due.

"Section 5381. No person or corporation shall, directly or indirectly, take or receive in money, goods, things in action, or any other valuable thing, any greater sum or value for the loan or forbearance of money or goods, things in action, or any other valuable thing, than in section 5380 prescribed."

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"Section 5390. All bonds, bills, notes, assurances, conveyances, and all other contracts or securities whatever, whereupon or whereby there shall be reserved, taken or secured, or agreed to be taken or reserved, any greater sum or greater value for the loan or forbearance of any money, goods, things in action, or any other valuable thing, than is prescribed in this act shall be void."

The statute of Illinois on this subject in force at the time the contract was made, and still in force, is as follows:

"If any person or corporation in this state shall contract to receive a greater rate of interest or discount than seven per cent. upon any contract, verbal ·or written, such person or corporation shall forfeit the whole of said interest so contracted to be received, and shall be entitled only to recover the principal sum due to such person or corporation. And all contracts executed after this act shall take effect, which shall provide for interest or compensation at a greater rate than herein specified, on account of nonpayment at maturity, shall be deemed usurious, and only the principal sum due thereon shall be recoverable." Hurd's Rev. St. Illinois 1912, c. 74, § 6.

Many important facts are undisputed, and therefore had best be set out here. These are:

The Clio Lumber Company, a corporation engaged in manufacturing lumber, was the owner of a large sawmill, large tracts of valuable timber lands, and several thousand acres of land from which the timber had been cut. It also owned all the capital stock of a short-line railroad constructed primarily for the purpose of carrying the logs to the mill, and the manufactured product from the mill to a trunk line. It is known as the Anderson & Saline River Railroad Company, and is duly incorporated as a railway. All of the capital stock of the Clio Lumber Company was owned by the Bluff City Lumber Company, another corporation, which sold the manufactured product of the Clio Lumber Company. The Clio Lumber Company had executed a mortgage on all of its property to secure a large indebtedness, and, having defaulted, suit was instituted in this court to foreclose the mortgage and a receiver was appointed to take charge of its assets. While these proceedings were pending, the Bluff City Lumber Company became insolvent, and, by a proper proceeding instituted in this court, a receiver was appointed to take charge of all its affairs and distribute the funds arising from the sale thereof among its creditors. Among the assets which thus came to the receiver of the Bluff City Lumber Company were the shares of the capital stock of the Clio Lumber Company. The capital stock of the Bluff City Lumber Company was all owned by one J. F. Rutherford and his wife, except that Mr. Rutherford had agreed to sell one-fourth of the capital stock to Mr. J. H. Allen, his nephew, when he paid for the same. But he had never paid for it, and therefore it was never delivered to him, but under this contract he claimed an interest in the Bluff City Lumber Company.

While these proceedings were pending, Mr. Rutherford died, and thereupon his wife became entitled, as dower, to one-third of all the stock owned by him at the time of his death, in addition to the stock owned in her own right. As administratrix of his estate she held the remainder of his shares of stock.

While the proceedings for the foreclosure of the Clio Lumber Company mortgage were pending, Mrs. Rutherford and her nephew, Mr.

Allen, believing that, as owners of the capital stock of the Bluff City Lumber Company, they had a valuable equity in the assets of the Clio Lumber Company, made strenuous efforts to obtain the money necessary to pay off the mortgage debt and reorganize the company, but had failed up to the time the final decree of foreclosure was rendered and the mortgaged premises directed to be sold by the master of this court. They thereupon employed Mr. B. J. Altheimer, an attorney then residing in Chicago, Ill., but who had previously resided in Pine Bluff, Ark., where the other parties resided, and was a friend of Mrs. Rutherford and Mr. Allen, to try to obtain the sum of $450,000 for the purpose of paying off the decree of foreclosure, which, with the costs and recciver's certificates which had been issued, was calculated to amount to that sum. The mortgaged property was estimated by them as being of the value of $1,000,000 or $1,200,000. Mr. Altheimer decided to go to New York and try to make arrangements for obtaining the $450,-000 to pay off this indebtedness. The unsecured creditors of the Clio Lumber Company, it was proposed, were to be paid in notes running one, two, three, four, and five years if accepted by them; that indebtedness amounted to between $90,000 and $100,000. A number of these creditors holding about 55 per cent. of these unsecured claims had agreed to accept that proposition, but the others had either declined or refused to commit themselves.

On his way to New York, Mr. Altheimer stopped off in Chicago, his home, to make an effort to secure the money there. Mr. Rutherford had had negotiations for a loan with the Commercial & Continental National Bank of Chicago before the foreclosure proceedings against the Clio Lumber Company were instituted, but for some reason had failed to secure the loan. Upon his arrival in Chicago, Mr. Altheimer called on a friend of his, Mr. Julius Lowenthal, a broker in that city, and asked him to introduce him to the officers of the Commercial & Continental National Bank in order that he might see them about securing the money needed for the reorganization of the Clio Lumber Company. Mr. Lowenthal introduced him to one of the officials of that bank, and thereupon Mr. Altheimer presented to him his application for the money. He was then referred to an officer of a trust company connected with the bank, and which dealt in matters of that nature, and after showing him what the assets consisted of, and assuring him that their value exceeded $1,000,000, was about to come to an understanding, when the officer learned that the property was in the hands of a receiver. As soon as he learned that fact, he broke off all negotiations, saying it would be impossible to sell the bonds to investors, as one of the important facts which investors would want to know was whether the concern had been successful. He informed Mr. Altheimer that the only institutions which would care to handle such a proposition were what are known as "realization companies." These negotiations having failed, Mr. Altheimer returned to Mr. Lowenthal, who thereupon introduced him to Mr. A. B. Newman, the payee of the notes now in controversy, and the president of the Illinois Realization Company, a corporation organized under the laws of the state of

Illinois, and whose business it is to purchase assets of insolvent concerns and rehabilitate them.

The undisputed testimony further shows that it was finally arranged between the parties that if, after investigation, the assets of the Clio Lumber Company were found to be of the value represented, or near it, Mr. Newman, acting for the realization company, would purchase them at the master's sale, provided the price would not exceed $450,-000; that any sum in excess of that amount should be furnished by Mr. Altheimer and his associates; that, when purchased by Mr. Newman, Mr. Altheimer and his associates were to organize two corporations under the laws of the state of Arkansas, one of the corporations to be known as the "operating company" and the other to be known as the "holding company"; that upon the organization of these corporations Mr. Newman was to convey to the holding company all of the assets acquired by him from the master's sale, except some assets which were to be conveyed by him to the operating company; that the consideration for said conveyances from Mr. Newman to these corporations was to be $597,000, to be secured by a trust deed or mortgage on all the property conveyed. All of the capital stock of the holding company was to be turned over to him as additional security, and also the stock of the Anderson & Saline River Railroad Company which had been owned by the Clio Lumber Company, and was to be obtained by him by his purchase of the assets of that company; that upon the organization of the operating company Mr. Altheimer and his associates should take $49,000 of the capital stock of said company, Mr. Newman retaining $51,000 as additional collateral security, Mr. Altheimer and his associates to pay for the stock $50,000 in cash, but after the sale had been made, Mr. Altheimer and his associates being unable to pay for any of that stock, it was agreed that all of this stock should be turned over to Mr. Newman as additional security.

The notes executed by the defendant were for $597,750, payable at different times as follows: $12,500 three months after date; $30,500 six months after date; $12,500 nine months after date; $30,500 twelve months after date; $12,500 fifteen months after date; $30,500 eighteen months after date; $12,500 twenty-one months after date; and $456,-250 two years after date. No interest was to be charged on these notes until after maturity, when they were to bear interest at the rate of 10 per cent. per annum. At the sale made by the master Mr. Newman purchased the assets of the Clio Lumber Company, paying therefor $450,000 cash; that was not quite sufficient to pay off the decree and all the costs, which amounted to about $470,000. Although Mr. Altheimer and his associates were to pay this excess sum with their own funds, they did not do so, but paid it out of the assets of the new corporations after they had been organized. The two corporations were organized, one of which was the defendant, the Virgin Timber Company, and the other called the Triangle Lumber Company. The lands, mill, and railroad were by Mr. Newman conveyed to the Virgin Timber Company after it had been organized, and the other assets to the Triangle Lumber Company. The Virgin Timber Company executed its deed of trust, in the nature of a mortgage, whereby it conveyed to the

plaintiff, Jacob Ringer, as trustee, all of the property which had been acquired by Mr. Newman and conveyed to that company, to secure the notes executed in conformity with the agreement hereinbefore set out.

Before the corporations were organized, a written agreement was made by the parties in pursuance of the former agreement as hereinbefore set out.

The first five notes were paid as they matured, and thereafter there was a default, and as the trust deed, as well as each of the notes, contained an acceleration clause, authorizing the holders of the notes to declare all of them due upon default in the payment of any of them, these proceedings were instituted to foreclose the mortgage.

On the part of the defendant it is claimed that the entire proceeding was merely a loan for the purpose of enabling a reorganization of the Clio Lumber Company and was so treated in all their negotiations, and that the purchase by Mr. Newman and the subsequent sale to defendant corporations was merely a device for the purpose of evading the usury laws of the state of Arkansas where the property is situated, as well as those of Illinois, where the negotiations were initiated and the notes finally made payable.

On the other hand, on the part of the plaintiff it is claimed: That the realization company, for which Mr. Newman acted, and which is the real party in interest, was expressly prohibited by its articles of incorporation to engage in the business of loaning money; its articles providing that its object is "to do a general brokerage and commission business, other than corporate stocks, and buy real estate at judicial, fiduciary, trustee's, pledgee's, mortgagee's and other liquidating or private sales, and to convert the property so bought into money, but not to engage in the business of loaning money." That it purchased these assets in good faith for its own use and sold them to the defendant, reserving to themselves what they considered a reasonable profit on their investment, their services, and the expenditure amounting to about $12,000 for counsel fees, investigation of the property, estimating its value, and other expenses connected with the transaction.

It is undisputed that these expenses were to be borne by the realization company, regardless of whether the negotiations resulted successfully or not.

[1] A preliminary question arose at the hearing when counsel for plaintiff objected to the introduction of oral testimony to vary the written agreements entered into by the parties. It requires no citation of a long list of authorities to show that this contention is untenable. As stated in Houghton v. Burden, 228 U. S. 161, 169, 33 Sup. Ct. 491, 493 (57 L. Ed. 780), where the precise question was before the court:

"Where the inquiry is whether the contract is one forbidden by law, it is open to evidence dehors the agreement to show that though legal upon its face it was in fact an illegal agreement. Otherwise the very purpose of the law in forbidding the taking of usury under any cover or pretext would be defeated. The defense is one which the debtor may make even though it contradicts the agreement."

The defendants, for the purpose of establishing their contention, introduced two witnesses, B. J. Altheimer and J. H. Allen, who con-

ducted the negotiations with Mr. Newman. Their testimony, in addition to the undisputed facts hereinbefore recited, tends to show that in their negotiations with Mr. Newman the fact that a sale would have to be had and the property purchased by Mr. Newman and the conveyances made to the new corporation was not mentioned at the first meetings; that what they wanted from Mr. Newman, and what was understood by him, was a loan of $450,000; that they asked for the loan for five years, but that Mr. Newman absolutely declined to make a loan for such a length of time, and at first insisted that if the loan was made it would be for not exceeding eighteen months, but finally agreed that it might be made for two years; that he told them, in order to make that loan, he would charge them interest at the rate of 8 per cent. per annum on the $450,000 for the full two years, amounting to $72,-000, although a part of it would be paid back sooner, and the further sum of $75,000 for his services, making a total of $597,000, which they would have to pay him to obtain the loan of $450,000. The additional $750 included in the notes, according to the testimony of the parties, represents the interest on the $450,000 for ten days at the rate of 6 per cent. per annum; the $450,000 having been paid for the purchase at the master's sale ten days before the final arrangements were made and the notes now sued for executed.

On the other hand, the testimony of Mr. Newman, as well as Mr. Ringer, his attorney, tends to show that when Mr. Altheimer and Mr. Allen came to see Mr. Newman they were at once told that this corporation was not permitted under its charter to lend any money; that it never engaged in making loans, but that its business was to purchase the assets of insolvents and then dispose of them at a profit, and that the only negotiations that could be had would be upon that basis; that until Messrs. Altheimer and Allen testified at the hearing of this cause they had never heard it intimated that there was any claim or could be any claim that the transaction was in the nature of a loan; that until the plea of usury was filed in this cause, and it was not pleaded in the original answer but only set up in an amended answer after the cause had been set down for hearing, they did not know that the transaction was claimed to be a loan, and usurious, nor upon what the claim was based.

It would serve no useful purpose to state in detail the conflicting testimony. The witnesses all testified orally, and the court finds from the evidence that, although Mr. Altheimer intended to obtain a loan, and probably treated it in his own mind as a loan, the plaintiff and his attorney, both of whom have been connected with this business since its organization in 1909, and were thoroughly familiar with the usury laws of Illinois, as well as those of Arkansas, never admitted that the transaction would be one of loan, but spoke of it at all times as a purchase of the property and a sale at a good profit.

In the opinion of the court the language of Judge Coxe, delivering the opinion of the Circuit Court of Appeals for the Second circuit in Re Canfield, 193 Fed. 934, 113 C. C. A. 562, and quoted with approval by the Supreme Court when that case was before it on appeal (sub

nom. Houghton v. Burden, 228 U. S. 161, 33 Sup. Ct. 491, 57 L. Ed. 780) is very apposite. He said:

"Why should Burden make an agreement to enable him to receive usurious interest and at the same time make it impossible for him to take such interest without placing him absolutely at the mercy of Canfield?

"There is no pretense that Burden was non compos mentis at the time, and yet it is difficult to believe that any rational being would have gone to the trouble and expense of having this elaborate agreement prepared for the purpose of avoiding the usury law and at the same time admit to the only man who could interpose a defense of usury that it was a void agreement. So far as the validity of the agreement is concerned, Burden might as well have stamped in red ink on its face the words 'void for usury.' We must assume that Burden is a man of ordinary common sense; but, in order to find that he made the statement quoted, we must convict him of stupidity which is unique in its originality. It is difficult to imagine that a rational being would procure a safe to protect him from burglary and immediately send the 'combination' to the burglar whom he had most reason to dread."

[2] But, regardless of the language used in the negotiations as descriptive of the transaction, if the transaction was in substance merely a device for the purpose of evading the usury laws, the plea must be sustained, for the law does not tolerate any device to avoid the consequences of unlawful acts. The authorities are unanimous that the courts will disregard the form which a contract may take, but look to the substance of the transaction in order to determine whether or not it is usurious. The books contain many cases where artful contrivances have been resorted to whereby the lender is to receive some other advantage or something of value beyond the repayment of the loan with legal interest. In Missouri, Kansas, etc., Trust Co. v. Krumseig, 172 U. S. 351, 19 Sup. Ct. 179, 43 L. Ed. 474, a novel device had been resorted to for the purpose of evading the usury laws, but it did not prevent the court from sustaining the plea of usury. When that case was before the Circuit Court of Appeals for this circuit (77 Fed. 32, 23 C. C. A. 1), Judge Caldwell, who delivered the opinion of the court, quoted with approval from Trust Co. v. McLachlan, 59 Minn. 468, 61 N. W. 560, the following:

"We had supposed that in the course of our professional and judicial experience we had met with about all the forms of contract which have been devised by the ingenuity of modern associations of this and similar kinds, but this one is entirely novel to us. It is certainly unique, and after a careful study of all its provisions it seems clear to us that it must have been contrived for the purpose of evading either the insurance laws or the usury laws, or both, of this state."

The finding of the Court of Appeals that the contract in that case was merely a device to obtain usurious interest on the loan was affirmed by the Supreme Court. 172 U. S. 351, 19 Sup. Ct. 179, 43 L. Ed. 474.

Leading cases on that subject which have been followed by all the American courts, are De Wolf v Johnson, 10 Wheat. 367, 385, 6 L. Ed. 343, and United States Bank v. Owens, 2 Pet. 527, 537, 7 L. Ed. 508. In the first-cited case the court held:

"Usury is a moral taint, wherever it exists, and no subterfuge shall be permitted to conceal it from the eye of the law; this is the substance of all the

cases, and they only vary as they follow the detours through which they have had to pursue the money lender."

In the Owens Case it was said:

"A profit made, or loss imposed on the necessities of the borrower, whatever form, shape, or disguise it may assume, where the treaty is for a loan and the capital is to be returned at all events, has always been adjudged to be so much profit taken upon a loan, and to be a violation of those laws which limit the lender to a specified rate of interest."

The devices resorted to for the purpose of evading the usury laws are so manifold that it is impossible to enumerate them. New schemes are continually devised, but the courts will not permit them no matter what disguise may be assumed, if, in fact and effect, it is but a device to obtain usurious interest.

In Re Fishel, 198 Fed. 464, 117 C. C. A. 224, the scheme was to pay the lender, in addition to the lawful rate of interest, a commission for collecting accounts assigned as collateral security. No actual rendition, of such service was contemplated, and the court held that it was merely a device to cover usury.

In Scott v. Fabacher, 176 Fed. 229, 100 C. C. A. 147, the scheme held to be usurious was as follows: Defendant lent the plaintiff $15,-000 to be used in the purchase of a tract of land which complainant expected to sell to a corporation at a profit. The transaction took place in Texas and a note was there given for the money payable there. At the same time a contract was entered into by the parties reciting, that in consideration of the loan complainant agreed to pay to the defendant three-fifths of the $10,000 profit realized from the sale of the land, and if such profit was not made to pay 10 per cent. on the loan,. and also to execute a deed of trust on some of his property to secure the performance of the entire contract. Plaintiff, having made the expected profit, executed his note to the defendant in the city of New Orleans for $6,000. The original note was paid, and in an action involving the $6,000 note the plea of usury was set up and by the court sustained.

In Missouri, Kansas & Texas Trust Co. v. Krumseig, supra, the scheme held to be usurious was as follows: A loan of $2,000 was made which was to be repaid in monthly installments of $30 for ten years, the debt to be canceled in case of the death of the borrower before all the payments were made. After a medical examination, the lender procured a policy of insurance on the life of the borrower to cover the loan, with deductions for each month's payments. This scheme was declared to be a cloak for usury by the Supreme Court of Minnesota in Trust Co. v. McLachlan, 59 Minn. 468, 61 N. W. 560; by Judge Nelson in Krumseig v. Missouri, K. & T. Trust Co. (C. C.) 71 Fed. 350; and the Circuit Court of Appeals for this circuit in 77 Fed. 32, 23 C. C. A. 1, and finally affirmed by the Supreme Court of the United States.

That a bona fide sale of property will not be declared usurious is true, as the element of lending and borrowing is absent; but in every

213 F.—64

instance the courts add, "unless it is a device to cover a loan and exact usurious interest."

[3] In the instant case the real facts, as the court finds them, are that Mrs. Rutherford and Mr. Allen believed that, as owners of the capital stock of the Bluff City Lumber Company, they had a valuable equity in the property of the Clio Lumber Company, worth at least $600,000, although, in fact, they had no such equity, that stock having vested in the receiver of the Bluff City Lumber Company; that by obtaining a loan of $450,000 on the security of the assets of the Clio Lumber Company they could save that valuable equity; that they employed Mr. Altheimer to procure a loan of that sum; whether to obtain the loan it would be necessary to have the property of the Clio Lumber Company sold by the receiver under the decree of the court, or obtain a discharge of the receivership upon payment of the mortgage debt and costs, was a mere matter of detail to be determined by the parties from whom the money was to be obtained. On the other hand, the realization company, having satisfied itself of the sufficiency of the security, was willing to furnish the money necessary to enable these parties to secure the assets of the Clio Lumber Company, and thus save for them the equity which they believed they owned; but it was unwilling to furnish the money at a lawful rate of interest, but would do so if it could secure a large profit, much in excess of the lawful rate of interest. To accomplish this it was necessary to resort to the scheme of a purchase and sale.

From time immemorial needy borrowers have consented to any terms imposed upon them, and in the opinion of the court the realization company was organized for the very purpose of taking advantage of the necessities of such persons. The plaintiff, Mr. Ringer, who was the attorney for the company, and who had prepared the articles of incorporation, a lawyer of great ability and experience, in answer to the question, "What is the object of the organization?" testified, "The prime object of its organization is to buy in property in liquidation, finance compositions, and rehabilitate the properties." Mr. Newman, the payee of the note, and president of the realization company, in reply to the question, "What is the business of the company?" testified, "To buy and sell properties of all kinds. We usually buy the assets of bankrupt estates from the court." The object of the realization company, as stated in its articles of incorporation, is to do "a general brokerage and commission business other than corporate stocks, buy real estate at judicial, fiduciary, trustee's, pledgee's, mortgagee's and other liquidated or private sales, and convert the property so bought into money, but not to engage in the business of loaning money." The insertion of this last clause "but not to engage in the business of loaning money" arouses a suspicion that it is to be used as a shield against a plea of usury. What was the necessity of inserting it? The law is well settled that a corporation can engage only in such business as the articles of incorporation authorize, either expressly or by necessary implication, and, if they fail to authorize the loaning of money, the corporation has no right to engage in it, and in a proper proceeding

its charter could be forfeited, if it engages in unauthorized transactions.

The circumstances surrounding this entire transaction are of such a nature that it is impossible to reach any other conclusion than that at least $75,000 of the $597,000 agreed on as the purchase money to be paid by the new corporation was a device to evade the usury laws. None of the parties connected with the realization company had any experience in the lumber business or the handling of large tracts of lands; they had no intention of having anything to do with the management of the business except so far as would be necessary to see to the proper application of the money realized from the operation of the plant. Mr. Ringer testified that during the negotiations Mr. Newman said:

"Altheimer, we never go into business where we have to operate it. We are not practical operators; we don't know anything about running a mill concern; we won't go in anything of the kind."

And speaking for himself he testified:

"Our company would not have bought that property if we had not had an understanding that Altheimer and Allen would look after it for us. In other words, we would not have come in here as mere naked bidders to buy a lumber concern; we might have bought standing timber, or might have bought the lands outright; we might have bought the tangible assets, but we would not have gone into any venture that required the operation of a plant if we had to do the operating. We were not qualified to do it."

From a careful review of all the evidence and the circumstances shown to have existed, it is clear that it was never contemplated by either of the parties that the property, when bought at the receiver's sale, should pass into the actual control of Mr. Newman or his company, further than was necessary to secure the money they were to advance and the profit they were to receive; that all the assets were to pass to the corporations to be organized for that purpose by Mr. Altheimer and his associates, subject to the mortgage to secure the money furnished by Mr. Newman, and the compensation he was to receive therefor. Under that agreement Mr. Newman could not sell that property to any other person, no matter how much more he could realize by such a sale. Another circumstance which must be taken into consideration is that $750 was added to the contract price, which all parties agreed was to pay interest on the $450,000 for the ten days which elapsed between the day the money was paid to the receiver and the transaction was finally consummated by the execution of the deeds and mortgage.

Cases directly in point are Tillar v. Cleveland, 47 Ark. 287, 1 S. W. 516, and Lowe v. Loomis, 53 Ark. 454, 14 S. W. 674. In the Cleveland Case, Cleveland applied to Tillar for a loan of $270 to purchase a lot and complete the building thereon, offering to pay 10 per cent. interest per annum, the highest rate allowed by the laws of the state. Tillar declined to make the loan at that rate of interest, but agreed to purchase the lot himself and sell it to Cleveland for $360, payable at the rate of $30 per month. This proposition was agreed to; the deed to

the lot was executed by the seller to Tillar, who took twelve notes of $30 each from Cleveland and executed a bond for title to convey the lot to him upon payment of all the notes. The court held that this was a usurious contract.

In Lowe v. Loomis the facts were similar to those in Tillar v. Cleveland, and the same conclusion was reached.

Ford v. Hancock, 36 Ark. 248, is another case in point. It was there held that, while it is not usurious for one to sell property on credit for a higher price than if sold for cash with the highest legal rate of interest added, the transaction is usurious if the sale be really made on a cash estimate and the amount is added for the time credit is given which is greater than the highest lawful rate of interest.

To the same effect is Grider v. Driver, 46 Ark. 50.

Brakefield v. Halpern, 55 Ark. 265, 15 S. W. 190, and Ellenbogen v. Griffey, 55 Ark. 268, 18 S. W. 126, cited for plaintiff, in no wise conflict with or modify the earlier cases hereinbefore cited.

In the Brakefield Case the facts were that Halpern, a merchant, had entered into an agreement with an organization of farmers to sell them goods at a net profit of 10 per cent. if paid for in cash and 20 per cent. above cost and carriage if sold on credit. There was no contract for a loan of money. Only two witnesses testified at the trial, which was had to the court, a jury having been waived, the plaintiff and the defendant. The plaintiff's testimony tended to show that it was a purchase and sale, while the defendant's testimony tended to show that it was in the nature of a loan. The trial court found the issue for the plaintiff. Upon appeal the judgment of the lower court was affirmed in a very brief opinion. The opinion reads:

"The only question presented for our consideration is: Was the verdict sustained by the evidence? The answer is: It was. It is unsatisfactory; but, as there was some evidence to sustain it, we cannot disturb it, but, on the contrary, affirm the judgment of the court below."

In the Ellenbogen Case the court reaffirmed the rule established in Ford v. Hancock, Grider v. Driver, and Tillar v. Cleveland, but held that they were inapplicable to the facts in the case before them. The court stated the facts as follows:

"In the case at bar it does not appear that Robbins ever applied to Ellenbogen for a loan of money, or that the former desired to borrow, or the latter to lend, money. Ellenbogen was the owner of store fixtures and a stock of liquors, and Robbins wished to purchase them."

The court found the transaction to be a bona fide sale and not borrowing or lending, and therefore not usurious.

In Wormley v. Hamburg, 46 Iowa, 144, property had been sold at a judicial sale, but before the time for redemption had expired a person other than the owner redeemed it and entered into an agreement with the original owner that he would convey it to him for a consideration equal to the amount paid to redeem the land and a profit equal to 40 per cent. This was held usurious.

In Wilkinson v. Wooton, 59 Ga. 584, the transaction held to be usurious was as follows: One held a bond for title to land, and, be-

ing unable to pay the balance due, entered into an agreement whereby the other was to pay the balance, taking a conveyance of the land and renting it to the original holder of the bond for title until he could repay the money loaned, at which time he was to have a conveyance and in the meantime pay rent for the use of the lands equal to 20 per cent.

Other cases in point are Ferguson v. Sutphen, 8 Ill. (3 Gilman) 547; Fiedler v. Darrin, 50 N. Y. 437.

[4] Counsel for plaintiff say that:

"There is no human being under any obligation to repay Mr. Newman this money. Mr. Newman's only chance is to get it out of the property."

It is true that the incorporators of the Virgin Timber Company were by Mr. Newman released from all personal liability which might arise from the fact that they had subscribed and issued to themselves, without paying therefor, the stock of the Virgin Timber Company; but the Virgin Timber Company is clearly liable for this debt, and, if it becomes seized of any other property than that covered by this mortgage, it will be liable for any deficiency after a sale of the mortgaged premises. It may be that it has no property subject to execution at present, but that does not relieve it of its liability nor deprive the plaintiff of having a deficiency decree against it. By the execution of the notes it obligated itself to repay the money at all events.

Eames v. Hardin, 111 Ill. 634, is cited on behalf of plaintiff as establishing a rule different from the one hereinbefore stated, and it is claimed, being in the nature of a construction of the Illinois usury statute, where the notes in this case are made payable, it should control. Assuming for the present that this contract is to be governed by the laws of the state of Illinois, the facts as found by the court differ so materially from those found in the instant case that it cannot be said that it conflicts with the rule established in Tillar v. Cleveland, supra, and the other cases hereinbefore cited. In that case it was held that to establish a deed, absolute in form, as a mortgage, the proof must be clear and convincing. The court stated the facts as follows:

"When appellants purchased the master's certificates, Hardin's relation to the property had ceased. He was then a stranger to the title. He expected, if he could control the title, to be able in a short time to turn the lots over to Cushman at a large profit on the price he agreed to pay for them; but Cushman having become insolvent, and unable to take and pay for the lots, and they, like all other property, doubtless having appreciated largely in value, he now is endeavoring to turn the transaction into a loan and mortgage, and thus make of appellants a portion of the profits he expected to, but did not, realize from Cushman."

The earlier decision of that court in Ferguson v. Sutphen, supra, is neither overruled nor modified by the Eames Case.

[5] As hereinbefore stated, the contract was finally executed in Arkansas, but the notes were made payable in Illinois, where the lender resided and carried on its business. As there is quite a difference in the penalties imposed by the laws of these states in usurious transactions, it is important to determine the laws of which state control this case. There is no proof whatever to justify a finding that in the specific acts of either the execution of the notes, or the selection of the

place of performance, there was any intention to evade the laws of either state. That being the case, the law of the state of performance, the state of Illinois, must control. De Wolf v. Johnson, supra; Miller v. Tiffany, 1 Wall. 298, 17 L. Ed. 540; Junction R. R. Co. v. Bank of Ashland, 12 Wall. 226, 20 L. Ed. 385; Bedford v. Eastern Bldg. & Loan Ass'n, 181 U. S. 227, 21 Sup. Ct. 597, 45 L. Ed. 834; Dygert v. Vermont L. & T. Co., 94 Fed. 913, 37 C. C. A. 389; Sawyer v. Dickson, 66 Ark. 77, 48 S. W. 903.

That the notes stipulated for a higher rate of interest after maturity than is permitted under the laws of Illinois, but which is permissible under the laws of Arkansas, is no indication of an intention by the parties to subject the transaction to the operation of the laws of a state other than that of performance so as to prevent the application of this rule. As the payee of the notes conducted his business in the city of Chicago, it is but reasonable that the notes should be made payable there.

The penalty for the usurious charges must therefore be determined by the laws of the state of Illinois, which is a forfeiture of all interest, but not the principal. The loan was for $450,000, to which should be added the $750, interest charged for the ten days hereinbefore mentioned, and which the defendant agreed to pay. From these sums the payments made by the defendant, amounting to $98,500, should be deducted, leaving a balance of $352,250, for which a decree of foreclosure may be entered.