STARK et al. v. BAUER COOPERAGE CO., and three other appeals. *

(Circuit Court of Appeals. Sixth Circuit. January 6, 1925.)

Nos. 3973–3976.

1. **Usury ⊚�longrightarrow113—Burden on person asserting it to prove contract clearly purporting to be sale of realty is mortgage.**

Burden is on person asserting it to prove that contract clearly purporting to be purchase of realty and resale to third person is mortgage.

2. **Courts ⊚�longrightarrow372(1)—Whether transaction mortgage or sale answered same in Ohio, where usury forfeits only excess interest, as in other states.**

Whether transaction is usurious mortgage or sale must be answered the same in Ohio, where usury forfeits only excess interest, as in state where all interest or even all principal is forfeited.

3. **Usury ⊚�longrightarrow31—Facts not conclusive as to whether transaction loan or sale stated.**

Transaction is not loan of money as distinguished from sale of realty because title is conditionally to be conveyed, because it is held as security, or because debt is absolute, since these are common elements of mortgage and sale, nor is it fact that title has recently been in apparent vendee and has been by him transferred to later vendor, even in connection with executory contract of sale to former owner, in itself determinative.

4. **Usury ⊚�longrightarrow31—Absolute character of existing debt important as tending to show transaction in which recent indebted owner becomes executory purchaser is mortgage.**

That recently indebted owner of realty has become merely executory purchaser thereof creates doubt whether transaction is in fact sale or merely mortgage, and in such case absolute character of debt becomes important as tending to show transaction to be mortgage.

5. **Trusts ⊚�longrightarrow41—In absence of contrary evidence, inferred that person buying property for another holds it in trust until repaid advance.**

Where one person buys property for another, only permissible inference, in absence

*Certiorari denied 45 S. Ct. 464, 69 L. Ed. —.

of contrary showing, is that he holds it in trust until he is repaid his advance, but parties may validly contract to create another relation.

6. **Contracts ⊚�longrightarrow143—Law will not lightly subject parties to code governing relations different from code they have deliberately agreed on.**

Where parties to transaction have deliberately adopted one code to govern their relations, law will not lightly subject them to different code, even though similar in many respects.

7. **Usury ⊚�longrightarrow31—Capitalist's purchase and carrying of property for speculator to be purchased by latter at advance held sale and not loan.**

Where speculator and capitalist had no existing relations, and speculator had no interest in property offered for sale, agreement that capitalist would buy property and carry it for speculator, who would buy it at an advance in price, held sale and not loan.

8. **Vendor and purchaser ⊚�Longrightarrow3(4)—That paper in language of option signed by optionee held not to make it bilateral contract.**

Mere fact that paper in language of option stating conditions of sale of land is also signed by optionee does not convert it into bilateral contract, in absence of any promise to buy.

9. **Usury ⊚⟹117—Evidence held not to show sale of realty subterfuge for usurious loan.**

Evidence held not to show that purchase and carrying of property for optionee and subsequent sale thereof to optionee at advance in price was subterfuge for usurious loan.

10. **Usury ⊚⟹6—Purpose of usury law to protect necessitous debtor against extortion.**

Purpose of usury law is to protect necessitous debtor against extortion which he is practically helpless to resist.

Appeals from the District Court of the United States for the Western Division of the Southern District of Ohio; John W. Peck, Judge.

Suit by the Bauer Cooperage Company against Edgar Stark, as executor, and others. Decree for plaintiff, and Edgar Stark, as executor, and others, the Union Savings Bank & Trust Company, and Lawrence Maxwell, Jr., separately appeal, and plaintiff brings a cross-appeal. Reversed and remanded.

Joseph S. Graydon, of Cincinnati, Ohio (Joseph L. Lackner, of Cincinnati, Ohio, on the brief), for appellants.

Murray Seasongood, of Cincinnati, Ohio (Lester A. Jaffe, of Cincinnati, Ohio, on the brief), for appellees.

Before DENISON, MACK, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge. An impecunious but optimistic speculator, who finds a

property for sale at such a bargain price that he sees a profit of 200 per cent. if he could buy it and hold it awhile, hurries to a moneyed friend, explains the situation, and says, "if you will buy this from the present owner, and then sell it to me on five years' credit, I will buy it of you at an advance of one-third over what you pay, and make my interest-bearing purchase contract and notes for that total sum." The friend agrees, and it is done. Later the buyer concludes that the transaction was a usurious loan to him. Is he necessarily right?

This we take to be a fair statement of the fundamental question in this case. To amplify it as far as necessary for a careful study we observe that in 1907 a tract of Kentucky timber and coal land belonged to one Crawford, who was in imminent danger of losing it upon a foreclosure sale, and was willing to part with his equity at a great sacrifice; that this situation came to the attention of Bauer,[1] who became convinced of the great value of the property and desired to buy it, but failed in his various efforts to raise the necessary money; that Bauer then brought the matter to the attention of Maxwell, and eventually, pursuant to his arrangement made with Bauer, Maxwell bought the property from Crawford and his mortgagees for $175,000 cash, and sold it to Bauer upon a land contract, with accompanying notes, for the total sum of $225,000, payable $25,000 down and $40,000 per year for five years, with interest at 4½ per cent. Upon full payment a deed was to be made. The last of the serial notes was due in 1912. From time to time payments and extensions were made, and Bauer continued completely to recognize the contract as valid according to its terms until about 1921—a total of 14 years. At that date, Bauer had kept up current interest, which had been from time to time, as a condition of the later extensions, increased up to 7 per cent., and had paid $120,000 of his notes, leaving two years' notes, $80,000, still unpaid. After some pressure to secure the payment of these, and after Bauer's affairs had passed into the hands of trustees for his creditors, these trustees caused this suit to be brought in the court below to obtain a decree that the original transaction was a mortgage loan; that the

debt, with lawful interest, had been paid in full; and that Maxwell should be directed to convey. In this general statement we have not overlooked some details which we later discuss and find not vital; nor will we give attention to the effect of the proceeding being in a court of equity, but will consider the question as if at law. The decree below gave Bauer substantially the relief sought. It avoided Maxwell's defense of laches, and did so by basing the relief upon Bauer's reply to Maxwell's counterclaim.

[1] It would not be possible to use more care than was given in this case to adopt the form of a sale and purchase and not of a mortgage loan. The complete legal title was perfected in Maxwell through several proceedings and through many details; it was allowed to rest there for a day before the sale contract to Bauer was made; this contract was in due form, as from vendor to vendee, containing the vendor's agreement to convey the property to the vendee after full payment of the agreed price, for which the vendee agreed to execute notes. It provided that the vendee might have immediate possession, should pay all taxes, should have the right to cut and sell timber, but every year should account to the vendors at agreed rates for any stumpage value in excess of the purchase price payments of that year; that the vendee might mine coal upon an agreed royalty to be applied on the purchase-money notes; that monthly statements should be made of timber and coal; and that the vendee would not assign or incumber the contract without vendor's permission. On both sides the parties were men of large affairs and long experience. As the district judge says, "They were highly competent to deal, and dealt at arm's length." Plainly he who would transform this contract into some different one, supposed to lie hidden in all these plain terms, carries a heavy burden.[2] As we understand counsel for Bauer, they frankly admit that, in this view of the facts, they can succeed only by establishing the affirmative of the broad question first stated.

Clearly the controlling question is whether this transaction, as finally shaped, was a

---

[1] Except where differentiated, we use "Maxwell" as meaning Maxwell and/or Schmidlapp, who was associated with him, and "Bauer" as meaning Bauer and/or Bauer Cooperage Company, his corporation.

[2] The proof must be clear, unequivocal, and convincing (1 Jones on Mtgs. [7th Ed.] § 335); it should leave no doubt that the real intention of the parties was to make a mortgage (Id., § 260); it must be clearly shown to have been intended as security for a debt (Wallace v. Johnstone, 129 U. S. 58, 64, 9 S. Ct. 243, 32 L. Ed. 619).

loan of money by Maxwell to Bauer, or was a contract of purchase and sale, and Bauer insists that it was the former. When able business men have carried out a contract for 14 years, without thought of its invalidity, it would seem that their belated discovery of the unknown vice ought to be fortified by abundant precedent and by clear reason. On the contrary, after consideration of all that has been submitted by the able counsel, and such independent study as we have been able to make, we find for their proposition no substantial basis in the principles involved, nor any support for it, more than colorable, in the decisions.

[2] It is usually, though not always, the usury laws that make important the difference between a mortgage and a sale contract; and, approaching from that standpoint, it must be first noted that this case arises only fortuitously in Ohio, where the usury law forfeits only the excess charge. The question "loan or not?" must be answered in the same way in Ohio as in a state where all interest, or even the whole principal, is forfeited.

[3, 4] Between a contract of sale and purchase and a contract of loan and mortgage there must be classifying distinctions, but they cannot be found in elements which are common to both. Such common elements are: First, each is accompanied by a defeasance; in the mortgage contract this may be expressly stated or may be implied even from oral proofs; in the sale contract it is the essence of the document; in each case, upon the performance of the conditions, the title, legal or equitable, passes to the one who has performed. Second, each is a security; one for the debt for money borrowed and the other for the purchase price debt. Third, in each there is an absolute, unconditional debt; the origin of one is the money which has been loaned; the origin of the other is the agreed purchase price; in neither case is the payor's promise optional, nor can he escape personal liability for a deficiency or its equivalent. Surely there is fallacy in the reasoning which says that a given transaction is a loan and not a purchase, because the title is conditionally to be conveyed, or because the title is held as security, or because the debt is absolute. The presence of one, or two, or three of these always common elements cannot be controlling in deciding whether a given transaction is a sale or is a loan; to suggest all or any one of them

as of decisive effect is to suggest this plain fallacy; and such decisions as seem to make any one of these—e. g., absolute liability—alone a sufficient criterion cannot, we think, have been well considered.

Nor can the fact that the title has recently been in the apparent vendee and has been by him transferred to the later vendor, even when in connection with an executory contract of sale back to the former owner, be of itself determinative. There are plenty of such transactions which are precisely what they purport to be.[3] When, however, we find that one recently the indebted owner has shifted his position and become merely an executory purchaser, an atmosphere of doubt at once arises; and in this atmosphere the absolute form of the debt may become highly persuasive. If there is an absolute promise to pay the same amount that he was formerly owing, and to do so as a condition of getting back the title with which he has just parted, the inference that there is nothing but a debt with security for its repayment becomes a strong one; but the debt which creates this atmosphere of doubt is not the new debt, it is the old one.

So far as we can find,[4] every case in which the existence of an absolute promise by an ostensible vendee to pay the sum involved has been thought to indicate that the transaction was merely a loan instead of having the character in which it was made to appear, is a case where the contract vendee had parted with his recent title and was arranging to get it back again. In no case was the contract one for the purchase of property which he had never before owned.

In this class are the numerous cases[4] in which it appeared that the owner, perhaps of real estate or perhaps of the accounts receivable in a going business, was hard pressed for funds to save or to benefit his property, and thereupon went through more or less complete forms of selling his property to another and simultaneously agreed to buy it back at an advanced price. It is not important whether the papers show on their face that this agreement for a repurchase exists or whether that is shown by parol; in either case, in construing the contract, it has seemed that the capital ad-

[3] Henley v. Hotaling, 41 Cal. 22; Conway v. Alexander, 7 Cranch. 218, 3 L. Ed. 321; Wallace v. Johnstone, 129 U. S. 58, 9 S. Ct. 243, 32 L. Ed. 619.

[4] See note at end of opinion for review of decisions.

vanced was really a loan secured by the property conveyed, and the capital-recipient's absolute obligation to repay has cut a figure in bringing this conclusion; non constat that the same rule applies when the first and only conveyance is a contract of sale from the one who has furnished the capital and running to a stranger, or when at the beginning of negotiations, the final contract vendee does not own the property, but covets it, and is not hard pressed but avaricious.

[5] In a line of cases[4] it has been held that, if A. wishes to buy a piece of land, and B. at his request advances the purchase price and takes the title to himself, he becomes as to A. a mortgagee, and the transaction is a loan. We do not question this conclusion. It is drawn from a transaction which confessedly is not what it appears to be, and whose true character must be determined. There is no contract between B. and A. expressly declaring their relations to be those of vendor and vendee, and fixing the incidents of that status. When it appears that B. bought the property for A., and nothing else appears, the only permissible inference is that he holds it in trust until he is repaid his advance. The law implies that simple contract naturally to be inferred from the facts, and does so because none other was made; non constat that it would imply one contract or one relationship when the parties carefully created and expressly declared another.

[6, 7] It would seem that the question, whether loan or sale, ought to be answerable as a primary one without reference to the usury laws and the policy which protects debtors against paying too much for a loan; but, even if this policy were taken into account, it is not seen how such an arrangement as this is obnoxious thereto. It is, in a fair sense, though not in the most common one, a joint adventure.[5] Bauer was to furnish the present opportunity and future management for making a large profit. The record suggests, though that is not important, that the actual profit after a term of years was not less than $350,000.[6] Maxwell was to furnish the capital. An equal or any other division of contingent profits would clearly have been permitted. Bauer preferred to take all the chances himself in exchange for the lion's share of the profits, and to accomplish this he was willing to guarantee to Maxwell a smaller but absolute gain. This was the substance of what he did, and we are unable to see that this joint adventure, thereupon and for this reason only, became nothing but a loan from one to the other.

In relying upon the measure of analogy with a clearly permissible joint adventure we do not overlook the analogy with the clearly forbidden usurious loan at the other end of the scale. In a broad sense there is equivalency between this transaction and an express loan by Maxwell to Bauer, secured by mortgage on Bauer's land; but this equivalency is vague, not close. It cannot be said that the legal title held by the grantee in a deed subject to a sale contract for $1,000 is the same as the equitable title held by a $1,000 mortgagee. There are differences in tax and other public obligations, in matters of possession and control, of foreclosure, of the extent and nature of the equity, of waste, of future statutory regulation and of other things, depending upon the laws of the particular state. When the parties have deliberately adopted one code to govern their relations, the law will not lightly subject them to a different code, even though similar in many respects. After all, reasons of equivalency are unsatisfactory in deciding whether loan or sale. Rules determinative of usury are often arbitrary. There is no substantial difference between a sale for $1,000, payable in five years with interest at 10 per cent. per annum (not annually) and a sale of the same property for $1,500, payable in five years, without interest; yet one necessarily involves usury and the other not (necessarily) at all.

This brings us to the formula by which the case was decided below. This was that a transaction could not be a sale when the purported vendor did not have the general title, but only the same special interest, which he retained after the purported sale. As applied, it was said that there was no sale from Maxwell to Bauer, because simultaneously with the passing of title from Crawford to Maxwell arose a duty for Maxwell to convey to Bauer; hence Maxwell's title was always special. We doubt the inerrency of this formula, even as applied to cases of deeds by an owner, accompanied by a contract of sale back; but in such cases the momentarily complete title in the first vendee, held by him only as a conduit for simultaneously passing it back to the first

---

[4] See note at end of opinion for review of decisions.

[5] See Orvis v. Curtis, 157 N. Y. 657, 52 N. E. 690. 68 Am. St. Rep. 810.

[6] This would be increased by $80,000 by the decree below.

vendor, may well be minimized. The first vendor starts with the general title, and ends with it, and really never loses it. This fact dominates the situation. Not so when the contract purchaser never had any title until he got it through the contract. There the contract vendor acquires the complete title, general and special, and has it until by the contract he parts with the general interest. To make · application here, Maxwell took the complete title coming from Crawford. True, Bauer had a right to a certain immediate transfer from Maxwell; but this was not an interest which had been so reserved to Crawford that it never vested in Maxwell. It did vest. It had to, for Bauer ever to get anything. So the formula in question is not helpful to us here, but only tends to mislead.

Just so with the matter of debt. "Once a debt always a debt." When one owes money to Paul and wants more time, and gains his end by borrowing from Peter, or by sale to Paul with a repurchase· contract, the debt equitably continues unchanged. It is the same debt, though it may now be called a purchase-money note. That is not the case here; there never was any debt from Bauer to Crawford, or to Maxwell, until it was created by ·this same contract which we are now to classify.

We therefore must conclude that the contract was one of sale and purchase, and not one of loan, unless our initial general statement was substantially' incorrect; and so we come to those facts which are said to make that 'statement .inaccurate, and in reliance upon which the decree below more or less depended. The first claim is that Bauer had the· general title, which he conveyed to Maxwell simultaneously with this contract back. If this were true, it would be at least important; but we do not so read the record. The claim, in this respect rests on these facts: Having learned of Crawford's willingness to sell at a bargain price, Bauer, in the name of his company, on May 7th, procured the paper set out in the margin.[7] Then he en-

deavored to provide for the money which would be necessary if he purchased under this arrangement, but found that $25,000 was the total which he or his company could raise. They were offered. that loan at their local bank. After Bauer's arrangement with Maxwell was substantially complete, Bauer drew $20,000 against this credit, and deposited it in Maxwell's bank. Before June 5th the arrangement with Maxwell had been completed in detail, and a quitclaim deed reciting a consideration of $20,000 running from Crawford to Bauer individually had been sent away for Crawford's execution. When it came back Maxwell caused the $20,000 in Bauer's deposit to be paid to or for the use of Crawford, and the deed was sent for record and received and recorded on June 5th.[8] · On June 7th Bauer (individually) and wife conveyed to Maxwell, and on June 8th Maxwell executed the sale contract already described running to the Bauer Cooperage Company and .not to Bauer personally, and received its notes, not his. There is no evidence, and no reason to suppose, that the $20,000 was paid except simultaneously with the delivery of the deed, or that this was delivered until just before its recording, The record supports no inference that Bauer acquired or held any interest under the Crawford-Bauer deed except under and as a part of this June 5-7-8 transaction.

[8] We are satisfied that Bauer's company received no interest in the land by the paper of May 7th. It was an option which contained no word of obligation by the Bauer Company. The mere fact that a paper in the language of an option, stating the conditions of sale, is signed also by the optionee does not convert it into a bilateral

---

[7] "This article of agreement, entered into this 7th day of May, 1907, by and between Rufe Ashurst of Somerset, Ky., duly authorized agent of R. S. Crawford, party of the first part, and the Bauer Cooperage Company, of Lawrenceburg, Ind., party of the second part, witnesseth:

"The said party of the first part· agrees to sell and have legally conveyed to the party of the second part, 30,000 acres of land, more or less, in Pulaski County, Ky., known as the Beaver Creek and Cumberland River Coal Company lands, and improvements on said lands.

"Consideration. There being a judgment against said R. S. Crawford on said lands for $155,000.00, said R. S. Crawford is to satisfy said judgment and have proper deed made by Commissioner of United States District Court for the Eastern District of Kentucky to party of second part or their assigns for the sum of $175,000.00. Said payments to be made in cash. Check to be made for same to satisfy the judgment· and balance to ·R. S. Crawford or his assigns. Said payments to be made on or before May 20, 1907, on tender of said deed.

 "(Signed in duplicate.)
                    "Rufe Ashurst,
               "Agent for R. S. Crawford.
          "The Bauer Cooperage Co.,
               "Jno. G. Bauer, Pres.

[8] The petition fixed June 7th as the date of the Crawford-Bauer purchase. The court below erroneously fixed May 29th.

contract. The omission of any promise to buy is too significant to be overlooked; the stating of a time limit for payment, with no provision as to what would follow nonpayment, strongly suggests a privilege to buy; and, if we are remitted to a question of intent, it is clear that the Bauer Company would not have intended to assume a liability for $175,000 which it knew it had no means of meeting within the short time fixed.

As to the deeds to and from Bauer individually it is insisted that a court of equity should overlook the distinction between Bauer and his corporation, which gave them different identities, and should overlook the fact that the deed from Bauer to Maxwell was a day earlier than the contract from Maxwell to the Bauer Company, and should treat this deed and contract as simultaneous, being parts of one transaction, composed of dealings with or by Bauer or his company indiscriminately. It is true that equity will not shut its eyes to the substance of a transaction and see only the form, but neither will equity open only one eye or look only part way through. We think equity should here see, first, in one class, the preliminary negotiations which led to an understanding, and then consider, as simultaneous, the group of acts which carried out that understanding. In this view, the payment to Crawford, his deed to Bauer, Bauer's deed to Maxwell, and Maxwell's contract back, are all successive parts of one transaction. The first step, the payment of $20,000, never would have been taken excepting as a part of the whole, since Bauer would not have consented to make this investment except as he, by the same arrangement, could save it. The deed from Crawford to Bauer was merely a convenient way of carrying out the plan to pass the title from Crawford to Maxwell. Bauer had been in treaty with Crawford and had had the option. Any technical, legal, and embarrassing effect which might have come from putting the title in the Bauer Company before it went to Maxwell, and then having the sale contract executed back to the company, was avoided by taking the first deed to Bauer individually, though the option was corporate. In other words, we conclude that, as a matter of form, there was no identity of parties, in the conveyances to and from Maxwell which would cause his ownership of the complete general title to become negligible, and, as a matter of substance, that the Bauer Company never had any title to or interest in

this property excepting that which it acquired by the same transaction by which it became the purchaser from Maxwell.

[9] Next, and finally, it is said that the forms of the transaction constituted a subterfuge, to conceal a usurious loan. It may be conceded that cases exist where A. buys property from a stranger at the request of B., and they execute a formal contract for its sale by A. to B. at an advanced price, in addition to interest, which B. absolutely undertakes to pay, and yet where the parties intend a loan, where the transaction is a loan, and where the form used will be treated as a subterfuge, but we see no justification for adopting that view here. To do so would be merely arbitrary. The record is clear, as the district judge found, that the parties did not intend to make a loan, but intended to do exactly what they did do. There is nothing to the contrary. We give no more credence than the district judge did—and that was none—to Bauer's testimony that Maxwell and Schmidlapp spoke freely of their $50,000 "bonus" and their "loans." For experienced and able lawyers and bankers to speak in that way would be an act of imbecility fully justifying the comments made by Judge Coxe upon a very similar situation (In re Canfield, 193 F. 934, 113 C. C. A. 562), and quoted by Mr. Justice Lurton in Houghton v. Burden, 228 U. S. 161, 172, 33 S. Ct. 491, 57 L. Ed. 780.

The fact that Bauer had at first applied to Maxwell's bank for a loan and thus initiated the negotiations has no net evidential force. It cuts both ways. The application was decisively refused and the subject of a loan was closed before the idea of buying and reselling was opened. So barren is the record of any intent other than that shown by the papers that to adopt the theory of subterfuge is to say that the law positively and always imputes the character of loan to the things done here, and that our initial question must be answered in the affirmative.

[10] We do not share the apprehension of Bauer's counsel and of the court below that, if this contract stands as written, a highway is pointed out to evade the beneficent purpose of the usury law. That purpose is to protect the necessitous debtor against extortion which he is practically helpless to resist. To adopt the usury laws to any other purpose is to distort them; and to carry them beyond their self-declared limits, through some vague thought of their spirit, is to take undue liberty. They select

the rate with no regard to specific benefits or burdens, and they select their beneficiary by using the word "loan." The owner of a valuable equity who deeds it and takes back an optional right to redeem in one year at a 20 per cent. profit is, practically, more oppressed and under a greater pressure to pay than if he gave his absolute but unenforceable promise to redeem a doubtful equity at 10 per cent. interest; yet the latter is usury (in Ohio) and the former is not; and the reason it is not is because there is no loan. So, we think that when the capitalist and speculator have no existing relations and the speculator has no interest in a property for sale, the agreement that the capitalist will buy the property and carry it for the other and that the speculator will buy it from him at a fixed price is not, ipso facto, a loan.

We conclude that there was no usury and that the sale contract should be enforced. This makes it unnecessary to consider the effect of Bauer's laches, not only upon his complaint, where the district court gave it effect, but upon his equivalent answer to Maxwell's counterclaim, where it was given no effect.

It follows that the decree below is reversed and the record remanded for a new decree in accordance with this opinion.

NOTE.—Of all the cases cited by counsel below, Ringer v. Virgin Co. (D. C.) 213 F. 1001, bears closest superficial resemblance; but there the debtors owned the equity they were trying to save, and, stripped of the foreclosure complication, the case is the typical one where the existing relations to the property by the ultimate contract purchaser and his interest in saving it from sacrifice make the first purchaser's temporary holding of the general title merely formal and negligible and create that atmosphere of doubt in which the final purchaser's absolute promise to pay is thought to reveal a "loan." This cannot reach a newcomer, a stranger to all existing interests. With Ringer v. Virgin Co., thus classified, go all the "assigned accounts" cases, reviewed in Le Sueur v. Manufacturers' Co. (C. C. A. 6) 285 F. 490, 496, and further instanced by Chase & Baker Co. v. National Co. (D. C.) 215 F. 633, and Re Grand Union Co. (C. C. A. 2) 219 F. 353, 135 C. C. A. 237; and go likewise the whole mass of cases where real estate is conveyed and a contract of repurchase is simultaneously taken back to the first grantor.

McDonough v. O'Neil, 113 Mass. 92, is a type of those cases where A., at B.'s request, buys from a stranger, takes an absolute deed, and claims title. If, as Judge Gray says, it is "clearly proved" that the consideration money was a loan from A. to B., a trust results. They are not helpful when the existence of any loan is the primary question; and they disclose no instance where an express contract of purchase was thought to be only a promise to repay borrowed money.

Clark v. Landon, 90 Mich. 83, 51 N. W. 357, is an instance of the numerous cases that put dependence on the absolute character of the debt; but, without exception, these cases refer to a continuing debt from the one who was vendor and is vendee. No one shows reliance on a new debt. As pointed out in the opinion, to rely upon the absolute promise as transforming a purchase contract into a mortgage security is to say that a sale contract is not a sale contract because it contains a thoroughly appropriate provision.

The same considerations apply to possession and tax paying. The vendee in an executory sale usually has possession and pays taxes. Nelson v. Wadsworth, 171 Ala. 603, 55 So. 120, like the others cited to this point, was dealing with an ostensible sale from the one who retained possession. Bauer never had any possession until it was delivered to him "as the agent of Maxwell." Also the decisions giving force to the fact that the first application was for a loan, like Mears v Strobach, 12 Wash. 61, 40 P. 621, deal with applications by the owner of the property, under pressure. By his necessity he is compelled to take his loan in any form he can get it. Not so with the volunteer, who has nothing and owes nothing.